*529 MR. JUSTICE SHEEHY
delivered the opinion of the Court.
On September 27, 1976, a citation was issued out of this Court to Joseph Goldman, of Missoula, Montana, an attorney admitted to practice before this court since 1948, directing Goldman to answer charges leveled against him in a complaint filed on the same date by the Commission on Practice.
The Commission on Practice acts under the aegis of this Court (Order Establishing Commission on Practice, Cause No. 10910, January 7, 1965) for the purpose of receiving, investigating, and reporting on allegations of misconduct of lawyers in the State of Montana.
The complaint against Goldman (hereafter “attorney”) stated 11 counts of misconduct by him in the practice of law. He filed his answer on November 12, 1976. He set up 3 defenses: first, he stated the charges as a whole and on their face did not constitute grounds to warrant discipline against him; second, he denied outright the charges of the complaint against him; and, third, he alleged the charges should be dismissed because of unreasonable delay in the filing of the charges, citing that: (1) there were indictments pending against him, (2) charges had been made that he had been engaged in a homicide conspiracy and (3) the lapse of time prevented him from having a fair opportunity to defend.
On September 6, 1977, after proceedings in the usual course before the Commission on Practice, the Commission filed its report, findings and recommendations. The commission had dismissed the allegations of counts 1, 2 and 9 against the attorney; and sustained in full the charges against him in all other counts. It recommended the attorney be disbarred from the practice of law in the State of Montana. The report, findings and recommendations were unanimously signed by all members of the Commission. < . .
The report came on for hearing before this Court on August 25, 1978, in camera, with counsel appearing for both the Commission on Practice and the attorney.
Now, having fully considered the arguments of counsel, the said Commission report, findings and recommendations, and the under *530 lying transcript and record, we conclude the report and findings of the Commission should be accepted and adopted by this Court and punishment fixed as hereafter provided. In the paragraphs following, we shall discuss our reasons in detail.
First, we will discuss the counts under which the attorney is charged, the evidence we find in the record with respect to those counts and contentions of the parties with respect to the evidence. Second, we shall discuss the applicable law and our reasons for accepting the report and findings of the Commission. Third, and lastly, we shall fix the punishment and explain our reasons for so doing.

Count Three

Here it is charged the attorney, representing Raymond J. Johns, on January 29, 1971., submitted to the Industrial Accident Board a medical report from Dr. Henry W. Hogan, which was false in that it greatly exaggerated the claimant’s degree of disability. It is further alleged the attorney knew of the falsity of the report at .the time the report was submitted.
In his answer, the attorney admits he represented Mr. Johns, and that he submitted a report on January 29, 1971 from Dr. Henry W. Hogan but denies remaining allegations of count 3.
Dr. Hogan testified before the Commission that he examined Johns-once on January 26, 1971 in Dr. Hogan’s office. Claimant had received a back injury when a large scraper he was operating hit a bump and Johns landed quite hard on the seat. Dr. Hogan’s examination revealed that though he could bend forward easily, the claimant had difficulty straightening up; he had pain on percussion over the left lumbrosacral joint, muscle spasm area bilaterally and a decrease of pinprick perception on the left.sacral nerve distribution. The rest of the examination was normal. On that basis, Dr. Hogan determined the claimant was suffering from a partially herniated lumbar disc and gave him a 25 percent disability of the body as a whole.
Before the commission, Dr. Hogan testified the disability was not permanent and that he did not mean to indicate a permanent disa *531 bility in his report. But Hogan also testified he did not relate to the attorney that in his opinion claimant did not have any permanent disability.
Thereupon, the witness Hogan was confronted with his testimony before the Grand Jury in Lewis and Clark County, on December 10, 1975, where Dr. Hogan had testified claimant did not have any permanent disability, and that he had related this to the attorney. Dr. Hogan said in his Grand Jury testimony that the attorney said, “Well . . . give him something.” This was said before the doctor wrote the report, according to the Grand Jury testimony.
At this point, the Chairman of the Commission interrupted the interrogation to state the Commission would consider the Grand Jury testimony as substantive evidence. We will discuss the legal aspects of this ruling further in this opinion.
The attorney himself testified before the Commission. When asked about the Johns medical report, the attorney testified, “I believe it to be true.”
The Commission also called Dr. Walker Schemm, as an expert, who testified that the symptoms contained in the Johns report, that is, stiffness and numbness, which were worse when claimant was inactive, were not typical symptoms for a herniated disc. He also testified in 85 percent of the cases involving a herniated disc, he would expect to find abnormalities on examination such as weakness, or loss of sensation or reflex changes, none of which he found in Dr. Hogan’s report.
The evidence is clear the medical report on claimant Johns was materially exaggerated. The conflict in the evidence as to whether the attorney knew of the material misrepresentation was resolved by the Commission in concluding that count 3 had been substantiated. The Commission is supported by substantial evidence in the record. It had a right to view the attorney’s credibility on this point in the light of all the other facts and circumstances of the. case.

Count Four

*532 This count charges the attorney represented Joe Assiniboine and in the course of that representation, he presented to the Industrial Accident Board a false medical report dated February 27, 1971, written by Dr. Henry W. Hogan and at the time the report was prepared and submitted, the attorney knew the report was false in that' it exaggerated and overstated the disability of claimant.
In his answer, attorney admits the representation of Joe Assiniboine, and that he submitted the medical report dated February 27, 1971, written by Dr. Henry W. Hogan, but denies every other charge against him in the count.
In his testimony before the Commission, Dr. Hogan brought out that he had written 2 medical reports on Joe Assiniboine on October 19, 1970, because two industrial accidents and two carriers were involved. One medical report referred to a disability of the right knee. With respect to the particular accident of July 10, 1970 for which the attorney was representing claimant, the doctor found claimant had a probable lumbar disc herniation. He found the ankle condition to be subacute with no likely improvement within the next 18 months and the necessity of some surgical intervention in the form of vein stripping. He found him totally incapacitated for usual activities.
Dr. Hogan examined claimant again on February 4, 1971 and wrote his second report on February 27, 1971 on which the charges are based. Again, he found a probable lumbar disc herniation with serious doubt as to whether any treatment, medical or surgical would have a curative effect. He considered claimant permanently disabled and did not know which disc had herniated, though he felt it was high in the lumbar region.
Before the Commission, Dr. Hogan denied he had ever told the attorney claimant Assiniboine was not so badly injured or damaged as his reports indicated.
Again Dr. Hogan was confronted with his testimony before the Grand Jury. There, on December 10, 1975, the doctor had testified that before he had sent his written evaluation over to the attorney, he had talked to the attorney on the telephone, and told him the *533 claimant Assiniboine was not so badly damaged or injured as the report indicated. He further told the attorney that Assiniboine could have worked as a supervisor at his job. The doctor also testified before the Grand Jury that although he had rated Assiniboine as permanently disabled, that this was not true and he and the attorney had discussed a way of justifying this by relating the alleged' permanent disability to the job he liked to do rather than the job he could do. He further testified he felt the diagnosis of a lumbar disc herniation was probably not a true diagnosis.
The attorney, in his testimony, denied he had ever submitted any report from any doctor that was false.
With respect to the Assiniboine claim, Dr. Schemm testified since there was no neurological deficit when Dr. Hogan checked claimant and where basically the patient had complaints of back pain and right ankle pain, the normal course would be, before coming to a final conclusion of herniated disc, to investigate further.
The evidence is conflicting, but its weight sustains the conclusions of the Commission that count 4 had been substantiated.

Count Five

Here it is alleged that the attorney represented Richard Pearce and on his behalf submitted a false medical report dated February 9, 1972, signed by Dr. Henry W. Hogan. The falsity is alleged to be in the statement that claimant was 30 percent disabled, and incapacitated as a result of migraine headaches. It is further charged the attorney knew this report was false.
The answer of the attorney admits the allegations of count 5 but denies the falsity or knowledge of the falsity.
Dr. Hogan testified before the Commission that claimant Pearce was injured when he was struck alongside the head on December 4, 1970. Dr. Hogan made his report on February 9, 1972. He had not treated claimant Pearce for the injuries immediately after he had sustained them and it was Dr. Hogan’s recollection that he had seen Pearce only once. Dr. Hogan’s neurological findings were entirely normal with the exception of tenderness of the occipital *534 nerve, a common finding with respect to migraine headaches. He reported a history from claimant of episodic events, excruciating headaches which were incapacitating, lasting from 12 hours to 3 days. Dr. Hogan reported a fracture involving the foramen magnum and a chipped fracture in the posterior border of this portion of the skull. He did not have X-rays at the time he reported the chipped fracture. Before the Commission, Dr. Hogan claimed he must have called the X-ray Department of St. Patrick’s Hospital in Missoula and gotten such a report from that department, but he had no record of such a telephone call, or any written report respecting X-rays. The only knowledge he had of a chipped fracture was in a letter he had received from the attorney, dated December 1, 1971. Dr. Hogan rated the claimant 30 percent disabled from a medical viewpoint because of his migraine attacks. Dr. Hogan further testified he would relate the migraine headaches to the industrial accident and denied he had ever told the attorney at the time he submitted the report to him, that he could not relate the migraines to the industrial accident.
Again, Dr. Hogan was faced with his testimony before the Grand Jury. From that, it appeared on December 10, 1975, he had told the Grand Jury, although it was stated otherwise in his report, he could not positively relate the migraines to the industrial accident and with respect to the 30 percent incapacity figure, he stated, “it was just a guess. It was better than nothing.”
Also the evidence of Dr. Schemm was to the effect that the migraines would not be brought about by trauma or injury; the description for migraine headaches; he did not think it was logical to assume the patient was disabled because he had such headaches.
Again, the Commission determined the charge against the attorney with' respect to claimant Pearce was substantiated by the evidence. We agree.

Count Six

In count 6 it is charged that the attorney represented Leo F. Staat, and in connection with that representation submitted to the Industrial Accident Board a medical report dated November 10, *535 1970, signed by Dr'. Henry Hogan. It is charged the attorney knew at the time he submitted the document that it was false in that it greatly exaggerated and overstated the amount of disability of claimant, and that the disability, if any, was work related.
In his answer, the attorney admitted representing claimant Staat, and submitting the medical report, but denied every other charge against him.
Dr. Hogan, testifying before the Commission, stated claimant Staat had suffered burn injuries. When he first examined Staat, in October 1970, he found extensive burns and scarring on the right side of the body, but also found weakness, clumsiness, and numbness in the left forearm and deltoid muscles. Dr. Hogan made two reports respecting claimant Staat. In his first report, he indicated the scarring of the right side and the weakness or paralysis on the left side. He testified he made it known to the attorney that the neurological abnormalities on the left was not work-related or injury related. Dr. Hogan examined claimant Staat later, and made his report of November 30, 1970 in which he indicated claimant was an ironworker and was unable to carry on his capacity because of a limp arm and hand weakness and rated him at 50 to 60 percent disabled with the implication the disability was work-related. Dr. Hogan admitted before the Commission that his disability figure included the paralysis which was a major contribution to the disability figure and the work-related disability should have been 25 to 30 percent. He denied indicating to the attorney that there was little, if any, disability related to the work accident.
At this point, Dr. Hogan was again asked about his testimony before the Grand Jury. In that testimony, on December 10, 1975, he had stated there was little if any disability in claimant Staat, relating to the accident; that the 50 to 60 percent disability figure was a fraudulent conclusion and that he had informed the attorney of this.
With respect to claimant Staat, and the medical reports submitted for him, Dr. Schemm testified before the Commission that where a person is injured by an explosion from a tank, as was this *536 claimant, and the person is burned, it would not be medically possible that the burn, in and of itself, would affect the spinal column so as to cause paralysis.
The attorney’s testimony before the Commission, as with the other counts, was a general denial that he had knowingly submitted a false report to the Industrial Accident Board; however, the file in the Workers’ Compensation Division contained an interoffice communication reporting that the attorney had read over the telephone to James Carden the medical report of Dr. Hogan reflecting Staat.
The weight of evidence supports the conclusion of the Commission that the attorney was guilty of the charges in count 6.

Count Seven

In this count, attorney is charged with representing one Clarence W. Petersen and that in connection with his representation submitted to the Industrial Accident Board on April 9, 1971, a false report dated April 1, 1971 signed by Dr. Henry W. Hogan, which alleged claimant was 30 percent disabled and which was false in that the disability was substantially less, was not permanent, and was not attributable to a work-related accident.
In his answer, attorney admits the representation, admits submitting the report, but denies every other charge.
Claimant Petersen had been injured while employed as a heavy equipment operator. He was helping to start a tractor engine by pushing the crank with his right foot which slipped off the crank, so that this foot struck against the ground with great force with his right heel. Dr. Hogan testified the injuries resulted in a tear of the Achilles’ tendon and that at the same time, claimant had probably broken off an overgrown arthritic process in his sciatic notch which affected his nerve distribution and gave him pain and discomfort in his legs. His medical report indicated a 30 percent disability which, before the Commission, the doctor contended was work related.
In Dr. Hogan’s testimony before the Grand Jury, on December 10, 1975, he had testified with respect to claimant Petersen, that *537 the 30 percent disability figure was highly inflated and that he could not relate the medical problem to the industrial accident. He had also stated in the medical report the condition was permanent, whereas before the Grand Jury, he gave his opinion the condition was not permanent. He also told the Grand Jury had he related these facts to the attorney at the time he delivered the medical report.
Neither Dr. Schemm nor the attorney were asked specifically about the Petersen report, but we assume the general denial of the attorney that he submitted any false reports would cover the Petersen case also.
The conclusion of the Commission was that the charges on count 7 were sustained. That conclusion is supported by substantial evidence.

Count Eight

This count presents a different factual situation and charge than contained in earlier counts. In count 8, attorney is charged with attempting on or about December 1974 to persuade Patrick McDonald a client he represented before the Industrial Accident Board, to present to the Workers’ Compensation investigators false evidence and testimony with regard to his representation of McDonald in connection with the claim. The specific charges are: (l)that the attorney attempted to get McDonald to tell the investigators the attorney had been contacted by McDonald’s wife after McDonald was in the hospital as a result of the industrial trial accident; (2) McDonald had stopped in the attorney’s office, filled out the Workers’ Compensation claim form with respect to his injury which happened that day, and then proceeded to the hospital; (3) he importuned his client along this line on several occasions but; (4) subsequently, when the publicity attending the Workers’ Compensation investigation increased, he then advised McDonald to tell the truth.
In his answer, the attorney alleged: (l)he represented Patrick McDonald with respect to an industrial accident and that on numerous occasions he was contacted by and he did contact Patrick *538 McDonald; (2) that McDonald stopped by his office to fill out the original documents and questionaires submitted to him in connection with the claim; (3) the attorney denies he ever importuned McDonald or any other person to give a materially false Statement to such investigators and; (4) denied generally every other allegation of count 8.
Claimant McDonald testified before the Commission that on May 5, 1971 he had fallen from a scaffold while working on an overpass finishing cement. Immediately following the fall, he had gone to the office of the attorney, having first stopped at his own house to pick up his wife. The attorney recommended he go to the emergency room at St. Patrick’s Hospital, which claimant did. It appears from other testimony and documentary evidence, the claim forms regarding his accident were mailed out on the same day as the injury was received', and the forms were executed before claimant went to the hospital. Subsequently he received a settlement for his injury. After the completion of his claim, when investigators from the Attorney General’s office appeared in Missoula in connection with Worker’s Compensation cases, McDonald testified the attorney called him. The attorney was concerned the McDonald claim had been filed on the same day he fell off the bridge and he was further concerned it would look bad if McDonald was injured enough to go to the hospital that he stopped ^t the lawyer’s office first. McDonald then testified the attorney suggested that he report to the investigators that he went directly to the hospital and had his wife contact the attorney and thereafter McDonald had come to see the attorney. McDonald testified he agreed to do this and that later the attorney contacted him on two or more subsequent occasions to the same effect. On the fourth contact however, the attorney told McDonald to tell the truth. The problem, as McDonald understood it, was that the áttorney was worried about the appearance of “ambulance chasing”. McDonald did testify to the truth when he appeared before the Grand Jury.
The testimony .of the attorney before the Commission on this point was he had received in the mail the forms from investigators which should have been directed to McDonald. He called Mr. *539 Zanto, then head administrator of the Workers’ Compensation Division and Zanto advised the attorney the forms should be filled out and sent in. The attorney stated he then mailed the forms to McDonald with instructions he should execute and return them to the investigators.. After that, McDonald came to the attorney’s office on two occasions and each time refused to fill out the forms, although the attorney urged it should be done. The attorney also testified he told McDonald that in filling out the forms, he should tell the truth.
The Commission, in finding against attorney on this issue, stated the answers of the attorney in his testimony on this point was evasive and unsatisfactory. It appears from the attorney’s testimony that on the date McDonald was injured, the attorney did know McDonald had come to him before he had gone to any hospital or sought other medical help and the claim to the Workers’ Compensation Division had been filled out before McDonald went to the hospital. It is further undeniable from the testimony, the attorney knew when the investigation commenced that this fact would become public knowledge and it is quite apparent from the testimony that the attorney was anxious to avoid the possible charge of “ambulance chasing”. From those facts it appears quite acceptable that the testimony of McDonald is true that the attorney had importuned him that he tell the investigators he had gone to the hospital first before he got in touch with his attorney. In other words, attorney requested McDonald to give false testimony or false information to the investigators.

Count Ten

This charge related to the representation by the attorney of Michael Eichenlaub. This count alleges that on February 19, 1970 the attorney submitted to the Industrial Accident Board a report from Dr. Henry W. Hogan dated February 19, 1970 which was false in that it represented the worker, Eichenlaub, was disabled and unable to work when in fact he was attending school and employed part-time. It is also charged that on September 8, 1970, the attorney submitted to the Industrial Accident Board a medical report of Dr. Henry W. Hogan which falsely alleged the condition of *540 Eichenlaub had deteriorated in order to make a second claim for compensation; and the attorney had approached claimant to make such second claim.
The answer of the attorney admits the representation of Eichenlaub reports, but denies every other allegation of the count.
Claimant Eichenlaub testified before the Commission. He stated he sustained an injury on July 3, 1969 when he was working on a pile construction and was cleaning up underneath a bridge when a rock hit him on the left ankle. He was treated by a doctor with cortisone shots, a cast was applied and he was disabled for some time. Later in the fall of 1969, he was advised by his doctor that he could return to work. There was no construction work available at the time, however, so he worked in his home doing taxidermy.
When Eichenlaub’s compensation payments stopped, he went to see the attorney who then began to represent him. He was examined by Dr. Hogan in February 1970 at the suggestion of the attorney. He described his examination by Dr. Hogan thusly:
“A. Well, I sat down on a chair and Mr. Hogan was behind a desk and I took my boot off and elastic bandage and then he checked my foot and checked my reflexes and made me walk at the most I’d say 10 feet or 15 and then back and sit down. Then we started talking, you know, hunting and fishing and stuff.
“Q. Before you start talking about hunting and fishing, how much time had elapsed from the time you first saw tír. Hogan? A. I would say no more than 15, 20 minutes at the most.”
At the time, he described his ankle as being tender and “I could-n’t do no running or anything like that it would spring it again, but I was walking.”
In September 1970, he was examined again by Dr. Hogan in connection with his ankle injury. A point in issue is whether he came to Dr. Hogan the second time because of a worsened condition or whether he in fact was brought to Dr. Hogan by the attorney, at his instigation. Claimant Eichenlaub testified the attorney called him, and Eichenlaub then went to see the doctor. At the time of the call, he was working in his home shop. The condition of his ankle at that time was no worse than the first time he went to see Dr. Hogan.
*541 The examination by Dr. Hogan was much the same as the first, except the time involved was shorter. Eichenlaub did not indicate to Dr. Hogan in any way that the condition of his left foot had worsened since he was first examined by Dr. Hogan in February 1970. Shortly following this examination, he received another $3,000 as a second settlement.
Cross-examination of Eichenlaub revealed his ankle was still disabled some 7 years after the accident. It also developed he had been examined the second time by Dr. Hogan before the college year had started but that it was his intention at the time he was examined to begin his college education when the university opened for the fall quarter.
The attorney, in his testimony before the Commission, stated that Eichenlaub had come to his office on August 18, 1970. There Eichenlaub informed the attorney his ankle was still hurting him, and he had tried to work for 3 days but could not continue working because of the pain and tenderness in his left ankle. The attorney stated that Eichenlaub was wearing an Ace bandage at the time to give stability to his ankle. The attorney informed Eichenlaub if the condition had become worse, he would be entitled to further settlement from the Industrial Accident Board.
At the time of the first settlement, claimant Eichenlaub was a minor. The attorney testified his father and mother participated in handling the first settlement. In fact, he had them execute an instrument entitled Authority to Attach Funds. In effect, this instrument recites the father and mother, as parents of claimant Eichenlaub, refused to sign a petition for guardianship for the appointment of a guardian for the minor. The reason for refusing to seek the guardianship as given was because of the existence of creditors who could attach the funds of the minor. The instrument contains a hold harmless agreement to the law firm of the attorney from any criticism of any possible nature. There is a recitation that the parents have been advised “very carefully” by the attorney that the funds should be placed in a guardianship estate. The testimony *542 does not indicate clearly the reason for the execution of such an instrument or the wording of its title.
The attorney also testified that Eichenlaub’s mother, between the first and second settlements, had talked to him about the injured ankle of claimant and the mother advised him the boy’s foot had gotten worse. He stated the mother had indicated she felt the boy was entitled to more money.
However, Mrs. Myrtle Ann Eichenlaub, mother of the boy, also testified before the Commission. She denied talking to the attorney or making the statements attributed to her by the attorney.
Dr. Hogan’s testimony before the Commission was to the effect that upon his first examination of Eichenlaub, he had found continuing signs of tendonitis, post-traumatic, which interfered with his activities and assigned a 30 percent disability. He testified his second examination of Eichenlaub occurred because he received a letter from the attorney, dated August 18, 1970, in which the attorney informed Dr. Hogan, that since the last time he saw Eichenlaub, claimant’s complaints were greater than at the time of the first examination. Dr. Hogan examined Eichenlaub on August 18, 1970 and wrote the second report dated September 8, 1970, in which he stated the tendonitis was serious enough to rate Eichen-. laüb 40 to 50 percent disabled, considering his body as a whole; that Eichenlaub hoped to attend college but the doctor did not see how claimant could ambulate around the campus and that his foot and ankle were considerably worsened over their conditions in February 1970. Dr. Hogan did not recall Eichenlaub had told him the ankle was much worse, but he relied on the statements and letter of the attorney for that fact.
Dr. Schemm, in his testimony before the Commission, questioned the value of the medical reports in that the diagnoses of tendonitis are orthopedic matters, and he did not think Dr. Hogan, a neurologist, would logically be able to decide this kind of disability.
The Commission found the charges on count 10 had been substantiated. The evidence speaks out loudly and clearly in support of that finding.

*543
Count Eleven

This count differs from the other charges against the attorney, because in this count, a pattern of activity is charged against the attorney in that he, knowing Dr. Henry Hogan was in severe financial distress, and addicted to drugs, sought and obtained from Dr. Hogan a series of medical reports which were false in their conclusions. They were false because: (1) claimant was not disabled but the medical report indicated he was, or (2) the disability was not work related but Dr. Hogan indicated it was, or (3) the extent of disability was exaggerated and over-rated. It is also alleged this pattern was part of a scheme of the attorney to obtain from the Industrial Accident Board, or its successor, the Workers’ Compensation Division, significant sums of money for claimants who were not lawfully entitled thereto. It is charged that the pattern of conduct reveal a gross disregard for the highest standards of honesty, justice and morality and that he had demeaned the profession and practice of law and brought discredit to the Bar.
The answer of the attorney admits he obtained medical reports of Dr. Hogan but denies otherwise every charge brought against him in count 11.
A considerable portion of the record before the Commission on Practice relates to the financial and physical condition of Dr. Hogan, during the time he was issuing medical reports for the clients of the attorney, and the doctor’s deterioration as a medical profession by reason of his addiction to drugs. It is a sorry record. Out of respect to the doctor, we will not recite in detail what this record reveals, except to state the findings of the Commission on count 11 are fully substantiated in the following:
“. . . Specifically, the Commission finds that respondent (attorney) knew that Dr. Hogan was seriously addicted to dangerous drugs and alcohol, which adversely affected his health, his ability to function as a competent medical practitioner, his moral judgment and that as a result thereof, Dr. Hogan was in dire financial straits. Respondent (attorney) preyed upon the weaknesses and deficiencies of this medical practitioner. The Commission further *544 finds respondent guilty of a pattern of conduct consisting of deceit, collusion, false representations, and lacking in candor and fairness in his representation of clients before the Workers’ Compensation Division of the State of Montana which would result in exorbitant sums of money extracted from public funds . . .”
We have nothing to add to those conclusions, nor could they be better stated.
Applicable Law — Reasons For Accepting The Commission Report
We start with the proposition that an attorney must during the period of his authority to practice before the Bar of this State so conduct himself that he evinces a good moral character, a trustworthy nature and a true commitment of fair dealing with his clients. Fair dealing and honesty should be the trademarks of an attorney. In the Matter of Paddock (1967). 150 Mont. 59, 430 P.2d 361. These are the qualities which are essential for admission to the Bar, and if the attorney lapses from or ceases to possess those qualities, he or she is subject to our discipline, even to removal from the Bar. In Re Hansen (1936), 101 Mont. 490, 54 P.2d 882.
The duty of an attorney is broader than that of a trustee because the persons entitled to rely on the attorney cover a broader range. A trustee is responsible to his beneficiary, or persons claiming through his beneficiary, but an attorney’s responsibility runs to his clients, the Bar itself, the court and the general public. His duty of honesty and fairness toward all is at least that of a trustee, however, in the sense we pointed out recently, quoting Mr. Justice Cardozo:
“Not honesty alone, but the punctilio of an honor the most sensitive, is then standard of behavior.” Meinhard v. Salmon (1928), 249 N.Y. 458, 164 N.E. 545, 546, 547, 62 A.L.R. 1; Murphy v. Redland, et al., 178 Mont. 296, 583 P.2d 1049 (1978).
That standard of duty applies to activities in and out of the profession, as this Court said in its Advisory Opinion to the Commission on Practice (1971), 159 Mont. 541, 495 P.2d 1128:
“Any acts committed by an attorney, contrary to the highest standards of honesty, justice, or morality, including but not limited *545 to those outlined in section 93-2026, R.C.M.1947, and the violations of duties outlined in chapter 21, Title 93, R.C.M.1947, whether committed in his capacity as attorney, or otherwise, may constitute cause for discipline.”
Ultimately, the discipline of a member of the Bar falls upon this Court. We have that power and duty inherently and by virtue of constitutional provisions (1972 Mont. Const., Art. VII, § 2). It was to aid us in the exercise of that power and the performance of that duty that the Commission on Practice was established in 1965. Once the Commission has made its report and findings to us, it is still our duty to weigh the evidence upon which the findings rest. We have done that in the preceding paragraphs. It is the burden of the attorney to demonstrate that the findings are not supported by the evidence or the recommendations are erroneous or unlawful. The attorney has the burden to show the charges are not sustained by convincing proof and to a reasonable certainty.
When, as here, the findings rest on testimonial evidence, we are reluctant to reverse the decision of the Commission, which is in a better position to evaluate conflicting statements after observing the demeanor of the witnesses and the character of their testimony. See Zitny v.State Bar of California (1966), 64 Cal.2d 787, 51 Cal. Rptr. 825, 415 P.2d 521.
With that background, we proceed now to examine the legal contentions of the attorney in opposing report of the Commission.
In general, the attorney contends there was insufficient evidence before the Commission to establish the falsity of the medical reports and the attorneys knowledge of that falsity. It is also generally contended if the proof failed in those particulars, then the allegations in count 11, relating to the pattern of misconduct by attorney, must also fail, because the pattern cannot be established.
It is contended the evidence is insufficient to establish falsity of the medical reports and knowledge on the part of the attorney in that: (l)Dr. Hogan’s testimony is “tainted’; (2)impeachment testimony was used as substantive evidence by the Commission; and (3) the Commission disregarded the testimony of the attorney himself *546 in denying the allegations. It is also contended in connection with the falsity of the medical report the Commission should not have considered the evidence of Dr. Schemm. Regarding count 11, the pattern of misconduct, it is contended that the evidence is insufficient to establish that Dr. Hogan was, at the time he was making the reports in question, addicted to drugs so as to affect his judgment in any way, or to establish he was in financial trouble.
It is further contended that because the testimony which was given before the Grand jury and by affidavit of Dr. Hogan occured outside the presence of the attorney or his representatives, that thereby the attorney has been denied the right to confront the witnesses, the right of cross-examination, and he has been denied procedural and substantive due process and the equal protection of the laws.
There are other contentions not directly related to the evidence which we will discuss later.
It is to be admitted the contention with respect to Dr. Hogan’s testimony is a troublesome point. He testified before the Grand Jury in the Workers’ Compensation investigation as we have indicated above; he repeated that testimony in an affidavit supplied for the investigators in that investigation. He told investigators for the Commission on Practice a story agreeing with his Grand Jury testimony. When he was testifying before the Commission he recanted his earlier statements to the Commission investigators and in effect testified against what he had stated before the Grand Jury. Thus, regarding Dr. Hogan’s testimony, the Commission had before it a problem to determine when in fact Dr. Hogan was telling the truth. They resolved that problem by deciding he was being truthful in his testimony to the Grand Jury. Here, the rule that on testimonial evidence we will regard with great respect the findings of the Commission holds true. The members of the Commission, having an opportunity to observe the demeanor of the witnesses on the stand and to relate the other evidence of the case to the testimony being given by the witnesses, have reached conclu *547 sions which we do not think or find to be erroneous, much less clearly erroneous.
For the same reason, even though the attorney himself testified directly opposite the Grand Jury testimony of Dr. Hogan, it is clear the Commission, in judging the credibility of the attorney in relation to the totality of the evidence, found against him. Again, we agree with the conclusion of the Commission on this point. We find no basis upon which to set aside the findings of the Commission simply because the attorney himself denied the charges that were made against him. We recognize in so stating we are in effect accepting the “tainted” evidence of Dr. Hogan and rejecting the testimony of the attorney.
Our judgment is the Commission is supported by all of the facts and circumstances that appear in the evidence in this case.
Part of the totality of the evidence upon which we rely to sustain this judgment lies in the medical reports themselves. Most lawyers and judges have some experience with medical reports and have some knowledge of what they ordinarily contain in order to establish the conclusions reached by the medical person involved. These reports, on their face, fall short of what practicing attorneys and trial judges would expect to find in such medical reports. While we are bound by the record evidence and the testimony relating thereto, as is the Commission on Practice, we are nonetheless in the same position as trial jurors; we are not bound to bqlieve from the evidence what we would not otherwise believe as ordinary men and women, or in this case, as ordinary lawyers.
Turning to the evidence of Dr. Walter Schemm, once we accept the grand jury testimony of Dr. Hogan, and the falsity of the reports, the testimony of Dr. Schemm is merely cumulative in support of our judgment. However, Dr. Schemm’s testimony is also very helpful in determining the falsity of the medical reports that were submitted from Dr. Hogan. The attorney attacked Dr. Schemm’s testimony on the basis it is speculation and hearsay and an opinion based on an opinion, or perhaps an opinion based upon an opinion based on an opinion. The attorney argues no expert *548 should be allowed to advance an opinion as to what another man should observe (Pecos and N. T. Railway Company v. Coffman (Tex.Civ.App. 1913, 160 S.W. 145, 149); that is error to ask a doctor whether he concurs or disagrees with the opinion of another doctor regarding the extent and nature of injuries (Galveston H & H Railway Company et al. v. Alberti (1907), 47 Tex.Civ.App.32, 103 S.W. 699); and that opinion based upon opinions are improperly received in evidence and immaterial (Mount Royal Cab Company v. Dolan (Maryland 1935), 168 Md. 633, 179 A. 54, 98 A.L.R. 1106). Those cases and other cases cited by the attorney in support of this contention are distinguishable from the issue in the case at hand. In those cited cases the issue was the extent of the disability of an injured person. The courts held in those cases that an expert should reach his own conclusions based upon his own observations of the injured person and that is was improper to allow the expert to testify as to whether or not his conclusion agreed or disagreed with another doctor. In this case, the issue is different, whether the medical reports submitted by Dr. Hogan, on their face, met acceptable standards or provided sufficient medical information to substantiate the conclusions that Dr. Hogan was drawing as to the disability the respective claimant suffered and whether the disabilities were work related. In other words, the issue to be decided was not the actual injuries sustained by claimant; but whether the medical reports that Dr. Hogan prepared could be substantiated on the symptoms and histories he reported. Thus the issue here is entirely different, and the Commission followed a proper procedure in obtaining an expert to determine the validity of the conclusion set out in the Hogan reports.
The remaining question to be discussed with respect to the evidence is whether the Commission and this Court have the right to accept the Grand Jury testimony of Dr. Hogan as substantive evidence. While, as we have said, the totality of the evidence supports accepting the testimony of Dr. Hogan before the Grand Jury, it is obvious the Commission has accorded substantive status to the Grand Jury testimony. The attorney attacks this, saying that since *549 the hearing was held in June 1977, before the adoption of the Montana Rules of Evidence, which became effective on July 1977, the law of this State at the time was that impeachment evidence could not be considered as substantive. He cites a number of cases, including Wise v. Stagg (1933), 94 Mont. 321, 330, 22 P.2d 308; State v. Kinghorn (1939), 109 Mont. 22, 39, 93 P.2d 964; Batchoff v. Craney (1946), 119 Mont. 157, 162, 172 P.2d 308; Siebel v. Byers and Yurick (1959), 136 Mont. 39, 48, 344 P.2d 129; and State v. Jolly (1941), 112 Mont. 352, 355, 116 P.2d 686.
The Commission admits in its brief that prior to Jolly, supra, previous inconsistent statements of a witness were admissible for impeachment purposes only and did not constitute substantive evidence. The Commission, however, contends Jolly is a crossroads opinion because it is the last case which critically analyzed the permissible use of prior inconsistent statements. In Jolly this Court said:
“While the weight of authority would limit such evidence to the impeachment of the witness’ subsequent testimony on the stand (2 Wigmore on Evidence, 2nd ed., 459, sec. 1018), the better reasoning would seem to support the other view (3 Wigmore on Evidence, 3rd ed.,' 687, sec. 1018), since the prior statement is not properly subject to objection as hearsay, the witness being present in court for cross-examination concerning it.” 112 Mont. at 355, 116 P.2d at 688.
Two civil cases following State v. Jolly, supra, Batchoff v. Craney, supra, and Seibel v. Bruns and Yurick, supra, adhered to the old rule instead of following the suggestion in Jolly that the better view permits the consideration of prior inconsistent statements as substantive evidence where the witnesses are present for cross-examination. However, in 3 subsequent criminal cases, State v. Longacre (1975), 168 Mont. 311, 542 P.2d 1221, State v. Borchert (1970), 156 Mont. 315, 479 P.2d 454 and State v. Mally (1961), 139 Mont. 599, 366 P.2d 969, the Court permitted and considered the use of prior inconsistent statements favorably to support criminal convictions.
*550 With this background, the Commission on Rules of Evidence in proposing the new Rules of Evidence for this Court felt prior inconsistent statements were admissible as substantive evidence, and suggested for adoption, Rule 801(d)(1)(A), accordingly. This Court had approved those rules prior to the hearing hereunder, even though the effective date would not begin until July 1, 1977.
The foregoing cases would indicate the law in Montana on this point was in flux, but the Court was moving toward a change in the rule of Wise v. Stagg, supra. The matter is now settled with the adoption of the Montana Rules of Evidence. Such testimony is now clearly admissible for substantive purposes.
The testimony of Dr. Hogan was taken on May 7, 1977. In cross-examination before the Commission, Dr. Hogan testified that when he was being interrogated before the Grand Jury, he was lying. The Commission decided however, that when Dr. Hogan recanted before the Commission his Grand Jury testimony, he was actually lying before the Commission.
It is syllogism beyond our grasp to agree with the attorney that the Commission could use Dr. Hogan’s prior inconsistent statements before the Grand Jury to determine he was lying before the Commission but the Commission could not use that same testimony before the Grand Jury as substantive evidence to determine the gist of this case,
Dr. Hogan’s testimony before the Grand Jury does not stand alone. It is buttressed, as we have said, by Dr. Schemm’s testimony, by the inherent improbability of the reports themselves, and by the pattern of misconduct of the attorney which the evidence in this case establishes. But even if Dr. Hogan’s Grand Jury testimony did stand alone, it would be sufficient and could be considered as substantive by the Commission. This, because the attorney’s authority to practice law is a continuing question, and a determination of this particular attorney’s fitness to practice law, could have been considered by the Commission or this Court before or- after July 1, 1977. What we are concerned with in discipline cases is the protection of the public. Strict rules of evidence cannot be used to defeat *551 considerations of public welfare. In re Wilson (1953), 76 Ariz. 49, 258 P.2d 433.
The attorney has contended that because Dr. Hogan’s testimony was considered substantively by the Commission, the attorney has been deprived of due process, procedural and substantive, and the equal protection of the laws. Apparently the attorney means by this that because Dr. Hogan testified before the Grand Jury in the absence of the attorney, with no possibility of cross-examination by the attorney, he has thereby been deprived of Constitutional rights. All due process requires however, is the attorney be given a fair hearing before the Commission. He had received this. Every opportunity has been given to him to establish the charges against him were not true. That the Commission chose to believe Dr. Hogan’s testimony before the Grand Jury, rather than the testimony of the attorney and of Dr. Hogan before the Commission, is a matter relating to credibility and not to constitutional rights. If the attorney’s contention on this point were to be sustained, it would in effect negate any use of prior inconsistent statements, in any case, because rarely are prior inconsistent statements uttered at a time when cross-examination is available, except in discovery depositions.

Other Contentions of the Attorney

We have considered other contentions raised by the attorney on which he argues the report of the Commission should not be accepted. Chiefly, the other contentions also relate to the testimony of Dr. Hogan, but 2 of the contentions relate to the Commission itself.
The additional contention with respect to Dr. Hogan’s testimony involve the claim that he was coerced by the investigators from the Attorney General’s office to give his testimony before the Grand Jury by threats of prosecution and loss of his medical license. It is also contended by the attorney that at the time of the medical reports here in question, he was no longer addicted to drug’s; and further his financial situation had improved so he was not dependent upon this attorney for a material contribution to his support arising out of the medical reports.
*552 These contentions were before the Commission, which considered them, and by its decision rejected them. We do not find the Commission to be clearly erroneous in this respect. This is true also of the admission of exhibit No. 10, an affidavit which Dr. Hogan had given to the investigators corroborating his Grand Jury testimony.
The attorney contends it is improper for the chairman of the Commission on Practice to act as both the person in charge of the hearing, and as the trier of the facts. It is contended that instead of having the chairman determine rulings on evidence in hearings before the Commission, it would be proper that a law officer be appointed, to whom would be relegated the function of deciding from deliberations based upon the evidence.
In our establishing the Commission on Practice (January 5, 1965, Cause No. 10910) we provided that the chairman of the Commission shall act as a presiding officer where the Commission on Practice itself conducted any hearing.
We see no prejudice accruing to the attorney arising out of this provision, or out of this fact that the Commission followed it in conducting the hearing. The decision of the Commission was unanimous which is a significant aid on this point to determine that no prejudice occurred.
During oral argument in this matter, it was contended by one of counsel for the attorney, that the makeup of the Commission on Practice was such that it was “defense” oriented, and that an attorney whose business related to a “plaintiff’s” practice was not as likely to get a fair result from this Commission. We answer that contention in 2 ways: first, this Court has put it in the power of the Bar itself to determine who shall be the member of the Commission on Practice. We provided in our order establishing the Commission a term of 4 years for each member and further that the members shall be selected from lists of 3 attorneys elected by their peers in 8 different districts throughout this State. This Court has followed the practice of appointing the person who received the highest number of votes in each district. There has been no “stacking” of *553 the Commission on Practice because the members of the Commission are determined by the Bar itself. Second, we interpret this statement about the members of the Commission as one not attacking their integrities, but rather their predilections. If the contention were meant as an attack on the integrity of the members, we would not countenance such an attack in the slightest or for a moment. If it is a comment upon their predilections, then we state that their basic integrity would require them in spite of any leanings they may have, to overcome such tendencies, and to decide this matter fairly and impartially, based upon the evidence they received. In our firm opinion, this is what the members of the Commission did.
As an offshoot from the foregoing contention, it was also contended by counsel for the attorney that the attorney in this case was simply “playing the game”; that is, plaintiff’s attorneys have certain doctors to which they refer their clients for examinations and medical reports, and the defense attorneys in the same manner have conservative doctors whom they consistently use to obtain medical opinions that accord with their slant on the case. We are not blind to the fact that experts vary widely in their opinions, particularly in medical disability cases; and that lawyers, in representing their clients, will seek out experts more favorable to their side of the case. As long as the experts so acquired express their honest convictions, true advocacy is thereby served. An entirely different issue is presented when the expert’s opinions are dishonest, false or exaggerated, and the attorney with knowledge thereof submits such opinions to the trier of fact. Then the mills of justice are corroded. Permissible advocacy cannot in any sense be extended that far.
It is also contended we should take into consideration the fact that criminal indictments which were issued against the attorney were dropped. We were informed during oral argument that the State, after receiving the results of polygraph tests taken of the attorney, determined it could not prove the criminal charges against the defendant and so these were dismissed. These facts however, are no bar to our determination as to whether discipline should be applied to the attorney.
*554 “A state bar disciplinary proceeding may be maintained even though the accused attorney has been acquitted on criminal charges covering the same facts or has obtained a dismissal of such charges.” Wong v. State Bar (Cal.1975), 15 Cal.3d 528, 125 Cal. Rptr. 482, 542 P.2d 642.
The attorney raised a number of other arguments, but none significant enough to require comment here.

Determination of Punishment

Fixing the punishment of the attorney in view of the charges against him has been a source of great difficulty, in this case. The Commission on Practice recommended disbarment. Some members of the Court felt the record warranted following that recommendation. Other members of the Court felt considerations should be given to other factors, including these: the strongest evidence against the attorney is the “tainted” evidence of Dr. Hogan; other persons also involved in disciplinary proceedings arising out of the Workers’ Compensation investigation have not been visited with disbarment; the abortive and controversial handling of the Workers’ Compensation investigation itself; no dishonesty as between the attorney and his clients was revealed; and no previous record exists involving this attorney in disciplinary matters since his admission in 1948. All members of the Court however, accept the findings of the Commission, as we have above stated.
Having in mind all of the factors above recited, and the record in this case, and mindful of our duty that the public in all events must be protected, and to demonstrate to our fellow attorneys the concern of this Court for the preservation of the high standards of conduct in our noble profession, it is the judgment of this Court that the attorney, Joseph M. Goldman, shall receive a public censure in open court on a date and time to be set hereafter, and that for a period of 3 months, commencing on the date of said censure, the said attorney shall be suspended and prohibited from the practice of law in any form.
*555 ADDENDUM
During the oral argument before the Court in this case, an incident occurred that marred the otherwise orderly proceedings.
Before the hearing, counsel for respondent contended the oral arguments were an extension of the proceedings before the Commission on Practice so that the right of privacy prevails. Therefore respondent petitioned for arguments to be heard in camera before the Court. There being no objection from opposing counsel, this Court ordered a private.hearing. Reporters and others who had gathered in the courtroom were so informed, and they withdrew. However, 2 reporters stationed themselves in a hallway outside the courtroom, at an air vent that opened from the courtroom. There one reporter attempted to tape the oral arguments as they proceeded, and the other took notes of what he overheard. When their presence at the air vent was revealed to the Court, the oral arguments were interrupted and the two reporters were escorted into the well of the Court. There the Acting Chief Justice advised the reporters that any use of the information gained by them through the vent was forbidden until the decision of the Court in this case. Later that day, a written order of the Court informed reporters that any such forbidden use of the information would be considered a contempt of the Court.
In first light, the attempt of the two reporters to thwart the purpose of the Court’s order seems most inappropriate. However, we measure their actions considering their evident concern for the public’s right to know. We are gratified the reporters have not used the information they overheard and have thereby avoided a confrontation with this Court that would be distasteful and undesirable. The occurrence however, requires the Court to state publicly again the reasons underlying the confidentiality that surrounds proceedings before the Commission on Practice.
It may be observed that perhaps more than in any other profession, the high repute of a lawyer is his only asset. Against the shocking revelations of lawyers’ didoes in high places in recent years, there remains the solid fact that literally hundreds of thousandjs] of *556 lawyers in this country dutifully serve their clients in the conduct of their affairs. Still, a lawyer, otherwise reputable, might have his reputation smeared by unfounded charges or allegations.
There is no yardstick to measure the damage through loss of reputation done to a lawyer who is accused of unethical practices, either falsely, intemperately or sensationally. No restriction, withdrawal, or apology will restore his repute when, as in most cases, the accusations are found to be false or groundless.
Recognizing this, when the Commission on Practice was established by this Court, we provided a means to protect the lawyer’s reputation as long as his reputation deserved to be protected, but no longer. This case is one in point. Here the factors that have led us to our decision today are spread out for the press to quote and the public to know. The judicial process of dissecting the issues of fact and law and deciding the punishment could not have been adequately or fairly reported by the press if the proceedings had been open from the beginning. This fact does not spring from any intentional fault of the press, but from limitations over which it has no real control — limitations of space, manpower, proportion, legal expertise, and in the end, the limited news value of an individual lawyer’s reputation, once the case has lost its sensational aspect.
On the other hand, had respondent been cleared by the Court of the charges against him, we would have deemed his right of privacy and reputation more important to the conduct of the business of the Court than publication of the fact that charges against him were found wanting. In other words, we hold that public confidence in the judicial system requires privacy in such proceedings, but that publicity is necessary when the lawyer is found guilty of serious transgressions.
In those cases (they are not numerous) where private censures of attorneys have occurred, the transgressions have not been serious and most usually have been the result of thoughtlessness not sufficient to warrant public condemnation. In the manner of theologians, we require publication and public punishment for-transgressions of grave matter, sufficient reflection and full consent of the will.
*557 We trust the press and public will grant we are determined to police effectually and resolutely the dealings of attorneys to assure the high standards of ethics to which we have pledged to the Bar.
The right of the press and therefore the right of the public to know the underlying business of the Court clashes in these instances with the right of our citizens to a fair and effective justice system, obtained through competent courts, aided by competent courts, aided by competent attorneys. As in all such cases involving great public issues, a careful balancing of the rights of all parties is necessary. We have found such a balance in providing privilege to the internal workings of the Commission on Practice. We are no more willing to yield that privilege than the press is willing to yield its claim of right to protect its sources of information. Neither side can fault the other for that.
LEONARD LANGEN, District Court Judge, sitting in for MR. CHIEF JUSTICE HASWELL, and M. JAMES SORTE, District Court Judge, sitting in for MR. JUSTICE SHEA, concur.