No. 05-463

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 41

IN THE MATTER OF A.J.E., III,

    A Youth In Need Of Care.

APPEAL FROM:    The District Court of the Third Judicial District,
In and For the County Deer Lodge, Cause No. DN 2003-016,
Honorable Ted L. Mizner, Presiding Judge

COUNSEL OF RECORD:

    For Appellants:

        Kenneth A. Connors, Connors Law Firm, Anaconda, Montana (Mother)

        David L. Vicevich, Joseph, Vicevich & Whelan, Butte, Montana (Father)

    For Respondent:

        Honorable Mike McGrath, Attorney General; Jim Wheelis, Assistant
Attorney General, Helena, Montana

        Joan Borneman, County Attorney, Anaconda, Montana

        Michelle Sievers, Knight, Dahood, Everett & Sievers, Anaconda,
Montana (Guardian ad Litem)

Submitted on Briefs:  January 11, 2006

Decided:  February 28, 2006

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1    On May 18, 2005, the Third Judicial District Court, Anaconda-Deer Lodge County, terminated the parental rights of A.E. (Mother) and A.E., II (Father) with regard to their son, A.J.E., III (A.J.E.). On different grounds, both parents appeal. We restate the issues as follows:

¶2    1. Did the District Court abuse its discretion in terminating Mother's parental rights by concluding that conditions rendering Mother unfit to parent were unlikely to change within a reasonable time pursuant to § 41-3-609(1)(f)(ii), MCA?

¶3    2. Did the District Court abuse its discretion in terminating Father's parental rights because Father could not assume the role of parent within a reasonable time?

## BACKGROUND

¶4    A.J.E. was born on August 10, 2003, to Mother and Father. At nine days old, Mother, who suffered from bipolar disorder, took A.J.E. to visit Father at Montana Chemical Dependency Center (MCDC) where he was incarcerated for assault on a police officer. Concerned by Mother's disoriented appearance—she was wearing pajamas and two different shoes—and by the fact that A.J.E. was covered in feces and urine, MCDC called the Montana Department of Public Health and Human Services, Child and Family Services Division (State). Stephanie Galle, a social worker with the State, responded to the call and removed A.J.E. from Mother's custody. Galle had Mother taken to St. James Hospital for a crisis response evaluation; she was subsequently committed to the Montana State Hospital.

2

¶5 Galle transported A.J.E. to the office of Dr. Mark Rafferty, a family practitioner who had provided prenatal care to Mother. Dr. Rafferty noted that A.J.E. had lost weight and diagnosed him as suffering from failure to thrive syndrome. The District Court granted temporary legal custody to the State, which placed A.J.E. in foster care—where he has lived throughout the pendency of this case—and issued an order adjudicating A.J.E. as a youth in need of care.

¶6 On November 15, 2004, the District Court conducted a hearing for termination of Mother's and Father's parental rights. The court heard testimony from several professionals who had evaluated and/or worked with Mother and Father.

¶7 Dr. Rafferty testified that he had concerns over Mother's ability to parent. During Mother's postpartum visits, he observed Mother cause A.J.E. to become hypoxic by smashing A.J.E.'s nose against her breast tissue while breast-feeding him. Family members contacted Dr. Rafferty to complain that Mother failed to properly clothe and feed A.J.E. Dr. Rafferty also noticed a bruise and black eye on Mother and suspected that Father physically abused her. Although Mother denied that Father hurt her, family members confirmed Dr. Rafferty's suspicions.

¶8 Two clinical psychologists, Dr. Ned Tranel and Dr. William Cook, evaluated Mother to determine whether she could safely and adequately parent A.J.E. Dr. Tranel performed a psychological evaluation on September 24, 2003, concluding that Mother had three severe and chronic handicapping conditions relative to her inability to parent. First, she suffered from borderline level of intellectual functioning—a level slightly

3

below the cut-off point for mild mental retardation. Second, Dr. Tranel described Mother as having a brief psychotic disorder, meaning that while under stress, Mother would float into and out of reality. Finally, Dr. Tranel believed Mother had a grossly inadequate concept of parenting behaviors—sometimes described as a deficit in emotional intelligence, or a deficit in the ability to identify and utilize available resources for performing one's every day tasks. Such deficits, Dr. Tranel testified, could not be controlled with medication. Based on these conclusions, Dr. Tranel opined that Mother could not meet the minimal standards of parenting for a young child, even with rehabilitation.

¶9     Dr. Cook evaluated Mother on November 14, 2003, and reached conclusions similar to those of Dr. Tranel. Dr. Cook's testing results indicated that Mother suffered from a thought disorder or mood instability, exasperated by her failure to consistently take her medication. Persons with such a thought disorder often lack insight into their problems and tend to harbor anger and resentment towards others, while mood instability can preclude attending to the needs of a child and choosing appropriate peers. Dr. Cook noted that Mother had poor judgment and had difficulty protecting herself within a relationship, specifically with regard to Father; he expressed concerns that Mother would not be able to protect A.J.E. from Father. Dr. Cook further concluded that based on his evaluation, Mother did not have the ability to meet the needs of a child within a reasonable time.

4

¶10 The Court approved a treatment plan for Mother, which despite the State's assistance, she failed to complete. Specifically, Mother did not obtain medical and psychiatric diagnosis and treatment, nor did she consistently attend mental health appointments. Mother also failed to attend family and individual counseling and did not follow the guidelines of the visitation contract, as she failed to provide appropriate attention to A.J.E. during their visits. On one occasion, A.J.E. crawled dangerously close to a floor heater when Mother left him unattended. Moreover, Mother's in-home parenting coach had to perform many of the tasks Mother needed to do for herself, including preparing meals, getting bottles ready and bathing A.J.E.

¶11 Cheryl D'Remy, Mother's therapist at the Western Montana Health Center from August 2001 to June 2004, testified that during Mother's three years of treatment, she observed no change in Mother's ability to deal with life's problems. D'Remy found it difficult to work with Mother because Mother did not feel a need to make changes in her life and turned away from resources. D'Remy explained that Mother needed to develop many skills, including how to make healthy, appropriate companions, how to deal with conflict and stress, and how to manage money. D'Remy noted that Mother did not see the use in taking classes for stress and anger management or parenting, even though throughout treatment, Mother became easily stressed and reacted with hostility. Mother also excused Father's temper, which caused D'Remy to worry that Mother would not be able to shield A.J.E. from potential abuse.

¶12  Paula Van Meel, a family support worker involved in the parenting classes Mother attended, supervised some of Mother's visits with A.J.E; she testified that Mother needed cues in order to implement her parenting training. Although Van Meel believed that Mother loved A.J.E. and would not intentionally cause him harm, she expressed concern over leaving Mother to parent alone.

¶13  David Fenchak, the Executive Director of the Anaconda Family Resource Center, also supervised visits between Mother and A.J.E. Fenchak similarly opined that he did not feel comfortable leaving A.J.E. with Mother unsupervised.

¶14  With regard to Father, the State presented testimony from Dr. Tranel and Dr. Page, both of whom noted that Father's incarceration in the Great Falls Regional Prison created an initial prohibitory factor.[1]

¶15  Dr. Tranel testified first, providing the results of an evaluation he performed on Father at Montana State Prison on January 21, 2004—approximately ten months prior to the termination hearing. Because Father refused to complete the standard testing procedures, Dr. Tranel explained that he instead spent several hours talking with Father and reviewing voluminous records and data relating to Father's history. Dr. Tranel's findings included a diagnosis of antisocial personality disorder and poly substance dependence, as well as a suggestion of bipolar disorder. Dr. Tranel advised that Father could not adequately parent A.J.E. and, further, that it was highly unlikely that he would

---

[1] While Father resided in MCDC at the time of A.J.E.'s birth, by the termination hearing, he had been kicked out of the program for noncompliance.

be able to parent within a reasonable time because Father lacked awareness of his shortcomings and resisted treatment.

¶16 Dr. Page, who administered a battery of tests to Father on March 11, 2004, testified to having reached similar conclusions to those of Dr. Tranel, including a diagnosis of antisocial behavior. In particular, Dr. Page noted that Father's anger issues—including a tendency to act outwardly towards objects or people when enraged—could negatively affect his ability to parent. In addition, Father's one-dimensional awareness of parenting skills indicated that he would have trouble making spontaneous decisions in the best interest of a child. Moreover, Dr. Page testified that separating A.J.E. from his foster parents, with whom he had bonded, would likely cause A.J.E. to suffer reactive attachment disorder, hindering his ability to form healthy patterns of emotional growth. Based on these factors, Dr. Page concluded that Father could not safely parent A.J.E.

¶17 At the termination hearing, Father testified, setting forth reasons for why the court should provide him the opportunity to parent his son. Father testified that he had taken steps to rehabilitate himself, including attending group mental health treatment sessions and completing anger management, parenting, and cognitive principles and restructuring classes. Father pointed out that he completed these classes after Dr. Tranel and Dr. Page completed their evaluations.

¶18 To rebut Father's testimony implying that he had overcome his behavioral problems, the State elicited Dr. Page's opinion as to whether Father's rehabilitation

efforts improved his chances of parenting adequately. Dr. Page testified that despite his efforts, Father still lacked adequate skills to parent. In reaching this conclusion, Dr. Page relied on his professional experience, as well as an evaluation performed by Dr. Timothy J. Casey, another clinical psychologist, who met with Father in August 2004, a few months after Dr. Tranel and Dr. Page performed their evaluations and after Father had completed his rehabilitative programs.[2] Dr. Page noted that Dr. Casey presented an opinion consistent with Dr. Page's—that is, that Father did not have the appropriate level of skill to parent A.J.E. Dr. Page further testified that dramatic changes in individuals such as Father are rare.

¶19 Social worker Galle asked the court to terminate Father's parental rights, given Father's prison status, violent history and lack of relationship with A.J.E. Galle also asked the court to terminate Mother's parental rights because Mother failed to successfully complete her parenting plan and, in Galle's opinion, A.J.E. would not be safe in Mother's care. Moreover, Galle advised that removing A.J.E. from his foster home where he was thriving and bonded to potential adoptive parents would not be in his best interest.

¶20 Based on the testimony and evidence presented at the termination hearing, the District Court terminated Mother's and Father's parental rights and awarded legal custody to the State, concluding that since Mother's and Father's "conduct or conditions

---

[2]While Father requested Dr. Casey's evaluation and filed it with the court, he did not submit the report as evidence.

. . . are unlikely to change within a reasonable time," foster care and/or adoption served A.J.E.'s best interest.

## STANDARD OF REVIEW

¶21 We review a district court's decision to terminate parental rights to determine whether the court abused its discretion. The test for an abuse of discretion is whether the trial court acted arbitrarily, without employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice. However, because a parent's right to the care and custody of a child is a fundamental liberty interest, it must be protected by fundamentally fair procedures. To satisfy the relevant statutory requirements for terminating a parent-child relationship, a district court must make specific factual findings. We review those findings of fact to determine whether they are clearly erroneous. Lastly, we review the court's conclusions of law to determine whether the court interpreted the law correctly. *Matter of A.F.*, 2003 MT 254, ¶ 12, 317 Mont. 367, ¶ 12, 77 P.3d 266, ¶ 12.

¶22 The district court is bound to give primary consideration to the physical, mental and emotional conditions and needs of the child. Section 41-3-609(3), MCA. Consequently, the best interests of the child are of paramount concern in a parental rights termination proceeding and take precedence over the parental rights. Moreover, the party seeking to terminate parental rights must demonstrate by clear and convincing evidence that the statutory requirements for termination have been met. *Matter of A.F.*, ¶ 13.

9

¶23 We presume that a district court's decision in such a case is correct and will not disturb it on appeal unless there is a mistake of law or a finding of fact not supported by substantial evidence that would amount to clear abuse of discretion. *Matter of A.F.*, ¶ 14.

**DISCUSSION**

¶24 **1. Did the District Court abuse its discretion in terminating Mother's parental rights by concluding that conditions rendering Mother unfit to parent were unlikely to change within a reasonable time pursuant to § 41-3-609(1)(f)(ii), MCA?**

¶25 Section 41-3-609(1)(f), MCA, states that a district court may order the termination of the parent-child relationship where "the child is an adjudicated youth in need of care and both of the following exist: (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time." Section 41-3-609(1)(f), MCA.

¶26 Mother concedes that the District Court adjudicated A.J.E. a youth in need of care and that she failed to successfully complete a treatment plan approved by the court. However, Mother maintains that the court erred in concluding that the conduct or condition rendering her unfit to parent was unlikely to change within a reasonable time, as required by subsection (ii) of § 41-3-609(1)(f), MCA. Specifically, Mother contends that the District Court erroneously relied on "stale evidence and incomplete files" because Dr. Tranel and Dr. Cook performed their evaluations approximately one year prior to the termination hearing and lacked knowledge of her rehabilitation efforts.

10

Mother further points out that the District Court misstated in its conclusions of law "that both clinical psychologists had the benefit of the current evaluation of Dr. Tim Casey in reaching their conclusions" when the record shows that neither psychologist relied on Dr. Casey's report.

¶27 Mother cites to *In Re the Matter of J.C., Jr. and R.B.*, 2003 MT 369, ¶ 11, 319 Mont. 112, ¶ 11, 82 P.3d 900, ¶ 11, in which we held that a district court is required to assess "the past and present conduct of the parent" when determining whether the conduct or condition rendering a parent unfit is likely to change within a reasonable time. Mother emphasizes this Court's statement in *Matter of J.C.* that a district court should, at least in part, look to a parent's "present conduct." Importantly, however, we also emphasized in *Matter of J.C.* the importance of looking to a parent's *past* behavior in determining his or her fitness to parent in the future—without a "crystal ball," a decision to terminate parental rights must "to some extent [find basis in] a person's past conduct." *Matter of J.C.*, ¶ 11. This Court affirmed the District Court's decision to terminate J.C.'s mother's parental rights, even though she had made improvements, because his mother had a "history" of not following through with her "strides" and "steps." *Matter of J.C.*, ¶ 15. Moreover, we noted "that evidence of rehabilitation does not render a district court powerless to find future danger to the child, it is simply evidence to be considered by the district court." *Matter of J.C.*, ¶ 16. We therefore concluded that the court did not abuse its discretion when it found that the mother's history of noncompliance with her

11

treatment plan outweighed her more recent efforts to comply with the plan. *Matter of J.C.*, ¶ 17.

¶28 In this case, the District Court assessed evidence from a variety of professionals who had evaluated and/or observed Mother since A.J.E.'s birth. While the District Court misstated in its conclusions of law that Dr. Tranel and Dr. Cook relied on a current evaluation by Dr. Casey, when in fact, neither psychologist referenced a report by Dr. Casey, this misstatement amounts to harmless error. *See In the Matter of S.C. and L.Z.*, 2005 MT 241, ¶ 29, 328 Mont. 476, ¶ 29, 121 P.3d 552, ¶ 29 ("[a] harmless error does not mandate that we reverse a district court's judgment; an error must cause substantial prejudice to warrant reversal.") (citation omitted). The fact that Dr. Tranel and Dr. Cook evaluated Mother roughly one year before the termination hearing and did not rely on more recent information does not lessen the import of their testimony, which centered on Mother's chronic disabilities which preclude her from parenting adequately. Moreover, a therapist, a family support worker and the Executive Director of the Anaconda Family Resource Center—all of whom worked with Mother in the months after Dr. Tranel and Dr. Cook performed their psychological evaluations—testified that despite the State's efforts to help Mother learn necessary skills through parenting and anger management classes, she exhibited an inability to implement the lessons taught. Not one of these professionals felt comfortable with the idea of leaving A.J.E. alone with Mother.

¶29 Given the evidence presented at the termination hearing, we conclude that the District Court employed conscientious judgment and did not abuse its discretion in

concluding that "[t]he conduct or condition of [Mother] rendering [her] unfit is unlikely to change within a reasonable time." Section 41-3-609(1)(f)(ii), MCA.

¶30 **2. Did the District Court abuse its discretion in terminating Father's parental rights because Father could not assume the role of parent within a reasonable time?**

¶31 Section 41-3-609(4)(b), MCA, states that a district court may terminate parental rights without requiring a treatment plan if "two medical doctors or clinical psychologists submit testimony that the parent cannot assume the role of parent within a reasonable time." Section 41-3-609(4)(b), MCA. Pursuant to this section, the District Court terminated Father's rights based on the testimony of two clinical psychologists' opinions that it was unlikely Father would be able to parent within a reasonable time.

¶32 Father argues that the District Court erred in relying on Dr. Tranel's and Dr. Page's testimony because both psychologists evaluated Father before he engaged in various treatments through the prison system. Dr. Tranel evaluated Father roughly nine months prior to the termination hearing,[3] while Dr. Page conducted his evaluation approximately seven months before the hearing.[4] In the months after the psychological

---

[3]Father argues that Dr. Tranel failed to provide substantial evidence because he did not formally "test" Father due to Father's refusal to cooperate. In essence, Father challenges the admissibility of Dr. Tranel's testimony. However, because he did not object at the hearing, Father is barred from raising this issue on appeal. Rule 103(a)(1), M.R.Evid.

[4]Father also argues that the District Court violated his due process rights by permitting Dr. Page to testify that he had reviewed Dr. Casey's more recent evaluation of August 19, 2004 (which Father filed with the court) when Dr. Casey did not testify and his report was not admitted into evidence. Not only did Father fail to object to Dr. Page's testimony during the hearing, the District Court appropriately allowed Dr. Page's

13

evaluations and prior to the hearing, Father completed the intensive treatment unit at the Montana State Prison for chemical dependency, parenting, anger management, and cognitive principles and restructuring; he also attended group mental health counseling at the Great Falls Regional Prison. Father maintains that in light of these rehabilitative steps, Dr. Tranel and Dr. Page provided outdated reports and therefore, the District Court should not have relied on their testimony.

¶33 As we noted above, "evidence of rehabilitation does not render a district court powerless to find future danger to the child, it is simply evidence to be considered by the district court." *Matter of J.C.*, ¶ 16. While Father took steps to rehabilitate himself, the court determined that Father's extensive criminal history—including partner assault on Mother and violent behavior—as well as his lack of responsibility for behavior that made him unavailable to parent his child, contradicted his claims of rehabilitation. The court appropriately looked to Dr. Tranel's opinion that Father suffered from antisocial personality disorder, poly substance dependence and likely bipolar disorder, and Dr. Page's conclusion that Father's tendency to behave aggressively when angry would inhibit his ability to parent appropriately, as well as both psychologists' advice that it was highly unlikely that Father would be able to rehabilitate within a reasonable time.

¶34 Given Father's extensive history with mental instability, aggression and crime, as presented by two clinical psychologists, we conclude that the District Court did not abuse

testimony on the grounds that the information in Dr. Casey's report is of the type normally relied on by these clinical experts in the formulation of their opinions. *See* Rule 703, M.R.Evid.

its discretion in concluding that Father could not assume the role of parent within a reasonable time. In the best interest of A.J.E., the court appropriately ordered termination of Father's parental rights.

¶35    Affirmed.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS
/S/ JOHN WARNER

15