No. 04-562

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 81

IN THE MATTER OF STEVEN T. POTTS,     )      O P I N I O N
    )      A N D
an Attorney at Law.     )      O R D E R

¶1      The Commission on Practice of the Supreme Court of the State of Montana (the Commission) entered its Findings of Fact, Conclusions of Law, and Recommendations on January 5, 2006, regarding a complaint filed against Steven T. Potts (Potts), an attorney licensed to practice law in the State of Montana.  The Commission concluded that Potts violated Rules 1.2(d) and 3.3(a)(2) of the Montana Rules of Professional Conduct (M.R.P.C.) during his representation of heirs in a will contest.  We adopt the Commission's Findings of Fact and Conclusions of Law.  We order Potts to appear before this Court for public censure.

¶2      Potts presents the following issues for review:

¶3      1. Whether Rule 1.6, M.R.P.C., required Potts to maintain his clients' confidences to the exclusion of being candid with opposing counsel and candid with the tribunal.

¶4      2. Whether Potts violated Rule 1.2(d), M.R.P.C.

¶5      3.  Whether Potts violated Rule 3.3(a)(2), M.R.P.C.

¶6      4. Whether the Commission improperly excluded Potts's proposed expert witness testimony.

¶7      5. Whether the Commission improperly excluded a portion of Potts's testimony as inadmissible hearsay.

1

¶8    6. Whether the Commission's proposed sanctions are appropriate.

## FACTUAL AND PROCEDURAL BACKGROUND

¶9    This disciplinary action arises from Potts's representation in a will contest involving the estate of Ernestine Stukey (Ernestine). Ernestine died March 8, 2001. Ernestine was survived by her daughter, Evon Leistiko (Evon), her six grandchildren, including Tyson Leistiko (Tyson), and her niece, Charlene Howard (Charlene).

¶10    Ernestine executed a will on January 14, 1998, disinheriting Evon and bequeathing most of her estate to Charlene. The will designated Charlene and Ernestine's friend, Verna Kessner (Verna), as co-personal representatives of her estate.

¶11    Ernestine's mental health deteriorated over the next two years, and she was involuntarily committed to the Montana State Hospital at Warm Springs. Evon petitioned the Third Judicial District, Deer Lodge County, to become Ernestine's conservator. The district court appointed Evon as conservator. The law firm of Church, Harris, Johnson & Williams, P.C. (Ernestine's attorneys) represented Ernestine's interests throughout the conservatorship proceedings.

¶12    Evon filed an initial inventory (initial inventory) with the district court in the conservatorship proceedings, reporting Ernestine's net worth as $1,254,795. The initial inventory included several accounts with a total worth of approximately $270,000, that Evon held in joint tenancy ownership with Ernestine or in which Evon was named as a beneficiary to the accounts (joint tenancy accounts). Ernestine established these joint tenancy accounts with Evon in 1967 and 1991.

2

¶13 As Ernestine's conservator and guardian, Evon petitioned the court to distribute gift money totaling $160,000 from Ernestine's estate to family members. The district court denied the petition on January 24, 2001, and authorized Ernestine's attorneys to investigate Evon's conduct as conservator. Ernestine's attorneys petitioned the court to remove Evon as conservator as a result of the investigation. Ernestine's attorneys later filed an action seeking recovery of monetary damages for Evon's alleged breach of fiduciary duty and self dealing related to the conservatorship proceedings. Ernestine's attorneys alleged that Evon had misappropriated $10,000 of Ernestine's money and engaged in other mismanagement of Ernestine's funds while Ernestine was incapacitated.

¶14 Without notifying the district court or Ernestine's attorneys, Evon moved Ernestine to an assisted living facility in the state of Washington. Ernestine purportedly executed a second will (second will) with assistance of Washington counsel on February 12, 2001, while staying in the Alzheimer's Unit of the facility. The second will appointed Evon as personal representative and bequeathed the bulk of the estate to Evon and Evon's family.

¶15 Ernestine died on March 8, 2001. A will contest ensued. Ernestine's attorneys filed a petition in the Eighth Judicial District, Cascade County, on March 13, 2001, to probate Ernestine's 1998 will. Evon filed a competing petition to probate Ernestine's second will in Chelan County, Washington, on March 23, 2001.

¶16 Evon also filed a second inventory (second inventory) with her petition to probate Ernestine's second will in Chelan County, Washington. This second inventory reported $1,253,000 as the gross value of Ernestine's estate. Evon's report of the estate's total

3

value in the second inventory comported with the total estate value in the initial inventory that she had filed in the conservatorship proceeding in the Third Judicial District, Deer Lodge County. It also matched the total estate value that she reported in the final inventory (final inventory) to the Third Judicial District, filed May 10, 2001, in the conservatorship proceedings. All three inventories filed by Evon listed all of Ernestine's assets and included the joint tenancy accounts. None of the three inventories distinguished between probate assets and nonprobate assets, such as the joint tenancy accounts.

¶17 Evon retained Potts to represent her and the six grandchildren, including Tyson, in the will contest in the Eighth Judicial District, Cascade County. Evon's attorney in the conservatorship proceeding provided Potts with Evon's legal file. These files included the hearing transcript regarding the unauthorized gifts, the accountings, the inventories, and the wills.

¶18 Attorney Ward E. Taleff (Taleff) represented Charlene. Attorney Sue Ann Love (Love) represented the University of Wisconsin, a beneficiary under Ernestine's 1998 will. Attorney Greg Hatley (Hatley) represented a church holding a charitable interest in Ernestine's estate under the 1998 will. Attorneys from Church, Harris, Johnson & Williams, P.C., represented Ernestine's estate.

¶19 The parties agreed to mediate all disputes concerning the will contest and Evon's alleged misconduct in the conservatorship proceedings. Ernestine's attorneys filed a confidential settlement brochure that indicated the parties assumed a total estate value of $1.2 million, as Evon had reported in the three inventories, as the basis for settlement.

4

¶20 Potts attended the settlement conference on November 12 and 13, 2001, with his clients, Evon and Tyson. At that time, Evon already had claimed a fraction of the joint tenancy accounts and was working to obtain the rest of the $270,000. Evon never disclosed this fact at the mediation, even though the other parties apparently assumed that they were negotiating based on the $1.2 million total estate value that included the joint tenancy accounts. Potts also remained silent as to whether the settlement included the joint tenancy accounts.

¶21 The parties reached an agreement during the second day of the mediation. They drafted a memorandum of understanding (memorandum) before departing the mediation to memorialize the terms of their settlement. The memorandum purported to resolve both the will contest and conservatorship dispute. It called for portions of Ernestine's estate to go to specific beneficiaries and for fifty percent of the remainder to go to Charlene and for fifty percent of the remainder to go to Evon and Ernestine's grandchildren. The memorandum referred to the division of "the Estate," but failed to assign a particular dollar value to the total settlement. The memorandum also made no mention of the three separate inventories that Evon had filed in the conservatorship and probate proceedings as representing the value of "the Estate." The memorandum further stated that the parties would stipulate to the dismissal of the conservatorship action filed against Evon and the Washington probate proceeding. Glenn Tremper (Tremper), one of the attorneys representing Ernestine's estate from Church, Harris, Johnson & Williams, P.C., signed the memorandum along with attorneys Taleff, Love, and Potts. Evon, Tyson, Charlene, and Verna also signed the memorandum.

5

¶22    In the week following the settlement conference, Tremper suspected that Evon was attempting to secure the joint tenancy accounts. Tremper telephoned Potts to discuss the matter on November 20, 2001. Tremper wrote a letter to Potts on the same day as the telephone conversation, asking Potts to confirm that the parties had reached the settlement in the mediation "based upon the good faith assumption that Ernestine's estate includes the assets identified by Evon as belonging to Ernestine in her proposed Final Accounting before Judge Mizner," in the conservatorship proceeding. The final accounting of the conservatorship proceeding before Judge Mizner included the joint tenancy accounts and valued the total estate at $1.2 million. Tremper's letter requested that Potts let him know "immediately" if his clients had a different understanding of the settlement.

¶23    Potts showed Tremper's letter to his client, Tyson. Potts testified that he advised Tyson that any questions concerning what assets were included in the estate "will get cleared up," but that he would prefer to resolve any such dispute "sooner rather than later." Tyson instructed Potts not to respond because he wanted to deal only with a personal representative to be appointed later by the court. Potts did not answer the letter. Tremper construed Potts's silence as confirmation that the parties had based the settlement on the $1.2 million total estate value that Evon had reported to the courts in the initial, second, and final inventories.

¶24    One week later, Potts drafted and circulated a stipulation that purported to resolve "all" disputes regarding the division of Ernestine's "estate" as stated in the memorandum. The stipulation called for the appointment of attorney R. William Walsh (Walsh) to serve

6

as personal representative of Ernestine's estate. The stipulation also dismissed the probate proceedings in Chelan County, Washington, and dismissed the conservatorship action against Evon in the Third Judicial District, Deer Lodge County. Potts, Taleff, Hatley, and Love signed the stipulation filed in the Eighth Judicial District, Cascade County on November 28, 2001. Attorney Dan Shannon of Church, Harris, Johnson & Williams, P.C., signed the stipulation on behalf of Tremper in representation of Verna and Charlene.

¶25 A battle soon erupted over the meaning and effect of the stipulation and the memorandum. Walsh filed a petition in the Eighth Judicial District on September 3, 2002, asking for the court's direction on distribution of the joint tenancy accounts. Charlene argued in response that Evon was not entitled to claim the joint tenancy accounts outside the settlement agreement. The district court held a hearing on February 3, 2003, and determined that Evon had no right to the joint tenancy accounts because the parties had relied on the $1.2 million total estate value, as she had reported in the final inventory in the conservatorship proceeding, as the basis of the settlement. We affirmed the district court's determination that, although the memorandum was ambiguous, the parties intended the $1.2 million total estate value, including the joint tenancy accounts, to be included in the memorandum and the settlement. *In Re Estate of Stukey,* 2004 MT 279, ¶¶ 75-76, 323 Mont. 241, ¶¶ 75-76, 100 P.3d 114, ¶¶ 75-76. (*Stukey I*). We later affirmed the personal representative's request to distribute the estate according to the formula set forth in *Stukey I. See In Re Estate of Stukey,* 2005 MT 349N, 330 Mont. 401, 126 P.3d 507. (*Stukey II*).

7

¶26    The Office of Disciplinary Counsel of the State of Montana (ODC) received a complaint regarding Potts's conduct surrounding the settlement. ODC investigated and filed a formal complaint against Potts on August 19, 2004, alleging that Potts committed two counts of professional misconduct. The first count alleges that Potts engaged in or assisted in client fraud, a violation of Rule 1.2(d), M.R.P.C., by following his client's instructions not to disclose material information to opposing counsel. The second count charges that Potts breached the duty of candor to the tribunal, a violation of Rule 3.3(a)(2), M.R.P.C., by failing to disclose material information to the district court presiding over the contested will action.

¶27    The Commission heard the matter on July 27 and 28, 2005. Tremper testified before the Commission that "the estate" encompassed the $1.2 million total value of Ernestine's estate, as Evon had reported to the courts in the initial, second, and final inventories. Tremper admitted that he knew Evon had asserted an interest in at least some of the joint tenancy accounts. He testified that he believed, based on discussions at the mediation, however, that the settlement included the joint tenancy accounts to satisfy both the will contest and the claim for damages related to Evon's alleged mishandling of funds while Ernestine had been incapacitated. Tremper also testified that Potts assured him in their telephone conversation shortly after the mediation that the settlement encompassed the $1.2 million total value of the estate. Potts denied having made the statement.

¶28    Potts testified that he believed the settlement conference included only probate assets and not the joint tenancy accounts that Evon held with Ernestine. He further

8

testified that he was "confused" by Evon's conduct regarding the joint tenancy accounts. Evon contradicted Potts, however, in testimony given at a February 3, 2003, hearing in the Eighth Judicial District to determine the basis of the settlement as stated in the memorandum. Evon testified that her lawyer knew, before the November mediation, that she had planned to obtain the joint tenancy accounts. The Commission admitted Evon's previous testimony at the disciplinary hearing. Potts does not contest here the Commission's decision to admit Evon's previous testimony on this point. Potts also admitted that Tyson had told him as early as four months before the mediation that Evon planned to obtain jointly held property regardless of the outcome of any settlement.

¶29 The Commission determined that the parties to the mediation had negotiated the settlement based on the $1.2 million total value of the estate as Evon had reported to the courts in three separate inventories and two petitions. The Commission found that Potts's clients, Evon and Tyson, had informed him well in advance of the mediation that Evon had intended to take the joint tenancy accounts outside of any settlement agreement. The Commission further found that Potts failed to answer Tremper's specific inquiry as to whether the joint tenancy accounts were included in the settlement. Potts instead had drafted and circulated the stipulation declaring that all disputes had been settled. The Commission found that Potts had failed to inform the district court and the other parties that the value of the settlement remained at issue.

¶30 The Commission concluded that, based on these findings, clear and convincing evidence supported the conclusion that Potts knew that his clients were using his services to perpetuate fraud in violation of Rules 1.2(d) and 3.3(a)(2), M.R.P.C., as the rules

9

existed in 2001. The Commission concluded that Potts's clients had negotiated a settlement based on Ernestine's $1.2 million estate and then improperly had taken money outside the settlement agreement. The Commission concluded that Potts had an ethical obligation to inform his clients that he would not actively or passively assist in their fraudulent conduct. As a result, the Commission determined that clear and convincing evidence supported the finding that Potts had failed to fulfill this ethical obligation, a violation of Rule 1.2(d), M.R.P.C. The Commission also determined that the duty of candor toward the tribunal under Rule 3.3(a)(2), M.R.P.C., superseded Potts's duty of confidentiality under Rule 1.6, M.R.P.C. Finally, the Commission determined that Potts violated his duty of candor toward the tribunal when he failed to disclose material facts to the district court. The Commission recommended that Potts be censured publicly, be suspended from the practice of law for a period of thirty days, and be required to pay the costs of the disciplinary proceedings. Potts objects.

## STANDARD OF REVIEW

¶31 This Court "possesses original and exclusive jurisdiction and responsibility under Article VII, Section 2(3) of the 1972 Montana Constitution and the provisions of Chapter 61, Title 37, Montana Code Annotated, in addition to its inherent jurisdiction, in all matters involving admission of persons to practice law in the State of Montana, and the conduct and disciplining of such persons." *See* Introduction, Montana Rules for Lawyer Disciplinary Enforcement (MRLDE). We created the Commission in 1965 to act under the aegis of this Court for the purpose of receiving, investigating, and reporting on

10

allegations of misconduct of lawyers in the State of Montana. *Matter of Goldman*, 179 Mont. 526, 529, 588 P.2d 964, 966 (1978).

¶32 As a result, our review of the Commission's decisions differs from the scope of review applicable in an appeal of a decision by an agency-selected hearings examiner, wherein such factual findings are difficult to overturn. *Goldstein v. Commission on Practice*, 2000 MT 8, ¶ 30, 297 Mont. 493, ¶ 30, 995 P.2d 923, ¶ 30. Instead, we review *de novo* the Commission's findings of fact, conclusions of law, and recommendations. *Goldstein*, ¶ 30. Our duty includes weighing the evidence upon which the Commission's findings rest. *Goldman*, 179 Mont. at 545, 588 P.2d at 974. Even in light of our duty to weigh the evidence, we remain reluctant to reverse the decision of the Commission when its findings rest on testimonial evidence. We recognize that the Commission stands in a better position to evaluate conflicting statements after observing the character of the witnesses and their statements. *Goldman*, 179 Mont. at 545, 588 P.2d at 975.

### DISCUSSION

¶33 *Whether Rule 1.6, M.R.P.C., required Potts to maintain his clients' confidences to the exclusion of being candid with opposing counsel and candid with the tribunal.*

¶34 Potts argues that Rule 1.6, M.R.P.C., prevented him from disclosing his clients' allegedly fraudulent conduct to anyone, including the court. Rule 1.6, M.R.P.C., prohibits a lawyer from revealing "information relating to representation of a client unless the client consents after consultation . . . ." Potts contends that his clients never consented to revealing such information. Potts further points out that Rule 1.6, M.R.P.C., sets out a few exceptions to the duty of confidentiality, but provides no exception for

11

reporting or disclosing client fraud. Potts contends that the Commission erred by failing to consider the duty of confidentiality under Rule 1.6, M.R.P.C., in its analysis of Rule 1.2(d), M.R.P.C., in which the Commission concluded that Potts had assisted in client fraud.

¶35 Rule 3.3(a)(2) sets forth the duty of candor toward the tribunal and prohibits a lawyer from failing "to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client." Once Potts made representations to the court in the signed stipulation, the duty of candor to the tribunal as stated in Rule 3.3(a)(2), M.R.P.C., trumped any duty of confidentiality that he owed to his clients. *See* State Bar of Montana Advisory Ethics Opinion 87-0326. Regardless of the duty of confidentiality as stated in Rule 1.6, M.R.P.C., Potts had an affirmative duty to be truthful in his statements to the court as mandated by Rule 3.3(a)(2), M.R.P.C.

¶36 Alternatively, Rule 1.6, M.R.P.C., may have absolved Potts from disclosing any information relating to the representation of his clients even if they had engaged in fraudulent conduct. Under Rule 1.6(b)(1), M.R.P.C., a lawyer may disclose information relating to client representation only if the client consents to a disclosure or to prevent a client from committing a criminal act that the lawyer believes is likely to result in imminent death or substantial bodily harm. The rule provides no exception for disclosing fraudulent conduct of a client to prevent, rectify, or mitigate fraud. Potts could not have disclosed his clients' confidences under Rule 1.6, M.R.P.C.

¶37 Rule 1.6, M.R.P.C., does not stand alone, however, and thus our analysis does not end here. Rule 1.2(d), M.R.P.C., prohibits the lawyer from counseling or assisting a

12

client to engage in conduct that the lawyer knows is criminal or fraudulent. Under certain circumstances, a lawyer's nondisclosure of a material fact can be taken too far even in light of the duty of confidentiality. Nondisclosure of client information "can amount to a misrepresentation in some circumstances and can also have the effect of assisting a criminal or fraudulent act by a client, thus implicating the lawyer in the client's wrongdoing." ABA Center for Professional Responsibility, *A Legislative History of the Model Rules of Professional Conduct* 215 (1999). Under Rule 4.1, M.R.P.C., such nondisclosures can be revealed only to "a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, *unless* disclosure is prohibited by Rule 1.6." (Emphasis added).

¶38    Here, Rule 1.6, M.R.P.C., prevented Potts from disclosing his clients' information because his clients had not consented to a disclosure and his clients' conduct was not likely to result in imminent death or substantial bodily harm so as to warrant disclosure outside of their consent. Potts cannot use the duty of confidentiality, however, to shield himself from other potential misconduct. Potts, while maintaining his duty of confidentiality, also must comply with the other rules of professional conduct, including Rule 1.2(d), M.R.P.C., the rule that prohibits a lawyer from assisting a client in fraud.

¶39    Rule 1.16, M.R.P.C., requires a lawyer to withdraw from representing a client if such representation will result in violation of the rules of professional conduct. Potts should have withdrawn from representation as soon as his clients' demands for nondisclosure of information propelled his services into the realm of assisting in his clients' fraudulent behavior. We concede that Rule 1.6, M.R.P.C., prevented Potts from

disclosing the information against his clients' wishes. We will not endorse legitimate nondisclosure under Rule 1.6, M.R.P.C., however, as an excuse for noncompliance with Rule 1.2(d), M.R.P.C. The Commission, therefore, did not err by failing to consider the duty of confidentiality in its analysis of whether Potts violated Rule 1.2(d), and assisted in his clients' fraudulent conduct.

¶40 *Whether Potts violated Rule 1.2(d), M.R.P.C.*

¶41 Rule 1.2(d), M.R.P.C., prohibits a lawyer from counseling "a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent . . . ." Potts argues first that his clients did not commit any underlying fraud so he cannot be accused of having assisted in fraudulent conduct. Second, Potts contends that the memorandum was ambiguous, as determined by our decision in *Stukey I,* ¶ 75, and thus cannot serve as a basis for determining fraud. Potts next suggests that he did not know at the time of the events that his clients' conduct was fraudulent. Finally, Potts asserts that his failure to apprise the other parties of relevant information falls outside the definition of fraud.

¶42 Potts argues that the Commission's finding that his clients engaged in fraud rests on the erroneous conclusion that the joint tenancy accounts were included in Ernestine's estate. Potts contends that his clients, Evon and Tyson, never engaged in fraudulent conduct because the joint tenancy accounts passed as a matter of law to Evon upon Ernestine's death and as a result could not have been included as a part of the settlement basis.

¶43 The 2001 M.R.P.C. fails to provide a specific definition of "fraud" or "fraudulent." The allegedly fraudulent conduct in this case surrounds Evon's

14

representations of the basis of the settlement value. Settlement agreements are contracts and subject to the provisions of contract law. *Dambrowski v. Champion Intern. Corp.*, 2003 MT 233, ¶ 9, 317 Mont. 218, ¶ 9, 76 P.3d 1080, ¶ 9. Under contract principles, a party's conduct rises to the level of actual fraud when he acts with the intent to deceive another to induce him to enter into the contract. *See* § 28-2-405, MCA.

¶44 A party commits actual fraud by making a "suggestion as a fact that which is not true by one who does not believe it to be true." Section 28-2-405, MCA. Actual fraud also occurs when a party suppresses "that which is true by one having knowledge or belief of the fact," or by making a promise without any intention of performing it, or through "any other act fitted to deceive." Section 28-2-405, MCA. Conduct constituting constructive fraud consists of "any breach of duty, which, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him by misleading another to his prejudice . . . ." Section 28-2-406, MCA.

¶45 Potts's clients refused to waive confidential mediation communications, thus we do not have the privilege of reviewing Potts's version of what happened in mediation. We are convinced by testimony of others and evidence presented at the disciplinary hearing before the Commission that Potts's clients, Evon and Tyson, engaged in fraudulent conduct during their procurement of the settlement agreement.

¶46 The evidence shows that Evon represented in three inventories to the courts that $1.2 million constituted the total value of Ernestine's estate. These inventories made no distinction between probate and nonprobate assets, such as the joint tenancy accounts.

By the time the parties met for mediation, Evon had taken a fraction of the joint tenancy accounts from the $1.2 million estate and was working to secure the rest.

¶47    By all accounts in the record, Evon never disclosed to the other parties at the mediation her intent to take part of the $1.2 million estate. Evon suggested as fact, or at the very least by her silence perpetuated, the untrue statement that the settlement basis constituted the full $1.2 million value of the estate. Evon knew, however, at the time of the mediation that the $1.2 million value did not represent an accurate settlement basis because she already had taken a fraction of that money and had intended to secure several hundred thousand dollars in the days after the mediation. Evon's misrepresentation of the value of the estate fraudulently induced the other parties to enter into the settlement agreement. The settlement agreement benefited Evon in that it included a stipulation to dismiss the conservatorship action against her and the potential liability associated with it.

¶48    Tyson also engaged in fraud by suppressing the truth that the settlement value could not have included the full $1.2 million. Potts testified that Tyson informed him months before the mediation that Evon had intended to take the joint tenancy accounts from the estate. After mediation, Tremper informed Potts and his clients, including Tyson, that Evon's final inventory comprised the basis of the settlement. Tremper requested that Potts notify him immediately if there had been a different understanding of the settlement. Tyson instructed Potts not to respond. Tyson's suppression of this relevant fact caused Tremper to believe that the settlement basis included the joint tenancy accounts.

¶49     We now turn to Potts's argument that we deemed the memorandum to be ambiguous in *Stukey I*, ¶ 75, thus it cannot serve as a basis for finding fraud. We concluded that the term "remainder," as stated in the memorandum, was ambiguous and capable of two meanings in that it may or may not have included the joint tenancy accounts in the estate value. *Stukey I,* ¶ 75. We also determined, however, that the "bulk of the evidence" showed that the negotiating parties had relied on Evon's final inventory, making no distinction between probate and nonprobate assets, for the basis of the settlement value. *Stukey I,* ¶ 76.

¶50     We recognize that the memorandum emerged after two long days of negotiations and the weariness of the parties likely contributed to its somewhat skeletal outline. Nonetheless the parties allowed material ambiguities to remain in the memorandum. The memorandum refers to the division of "the Estate," but makes no mention of the particular dollar value of "the Estate." Tremper testified that he believed that "the Estate" and the settlement basis included both probate and nonprobate assets to satisfy the will contest and damages sought for Evon's alleged breach of fiduciary duties in relation to the conservatorship proceedings. The memorandum hints at Tremper's belief by dismissing both the will contest and conservatorship dispute, but fails to state the inclusion of the joint tenancy accounts. These significant ambiguities lead us to agree with Potts that the memorandum cannot provide the sole basis for finding that Potts violated Rules 1.2(d) and 3.3(a)(2), M.R.P.C.

¶51     The memorandum constitutes only a first step, however, as most of Potts's alleged misconduct occurred after the parties had executed the memorandum. Tremper first

brought the memorandum's ambiguity to light in his telephone conversation with Potts. Tremper immediately followed up with a letter to Potts on November 20, 2001, asking for confirmation that the settlement amount included the $1.2 million total value relied on by the parties.

¶52     Potts's client, Tyson, could have been forthcoming with the truth—that Evon already had claimed part of the funds from the joint tenancy accounts and soon would grab the rest.  Instead, Tyson, with the help of Potts's services as a lawyer, encouraged the ambiguity by failing to respond to Tremper's inquiry.  Potts maintains he had no duty to correct opposing counsel's error.  We disagree.

¶53     Rule 4.1, M.R.P.C., prohibits Potts from knowingly making a false statement of fact to a third party.  Comment 1, Rule 4.1, ABA Model R. Prof. Conduct, provides that a lawyer, while having no affirmative duty to inform an opposing party of relevant facts, must be truthful when dealing with others on a client's behalf.  Comment 1 also warns that "a misrepresentation can occur if the lawyer incorporates or affirms a statement of another person that the lawyer knows is false . . .  or by omissions that are the equivalent of affirmative false statements."   Statements of price estimates or value during negotiations are not considered material facts requiring disclosure unless nondisclosure would otherwise constitute fraud.  *See* Comment 2, Rule 4.1, ABA Model R. Prof. Conduct.

¶54     In light of the guidance provided by the comments to the ABA Model Rules, we find the holding in *State ex rel. Neb. State Bar v. Addison*, 412 N.W.2d 855 (Neb. 1987), persuasive in this matter.  In *Addison*, the Nebraska Supreme Court determined that a

18

lawyer engaged or assisted in fraud and knowingly made a false statement of fact when he negotiated a release of a hospital's lien based on the hospital's mistaken belief that two insurance policies were in place instead of three. *Addison*, 412 N.W.2d at 856. The *Addison* court suspended the lawyer from practice for the period of six months based on the referee's findings that the lawyer's omission in failing to correct the hospital's false impression constituted a violation of the tenets of professional conduct. *Addison*, 412 N.W.2d at 856.

¶55 Similarly, Potts knew that the parties held different understandings as to the settlement basis and he failed to correct the mistake. Tremper's letter raised the question of whether $1.2 million represented the total value of the estate. The letter specifically requested Potts to respond if his clients had a different understanding as to the basis of the settlement. Tyson instructed Potts not to respond even though Tyson had told Potts months before that Evon intended to take the joint tenancy accounts outside of any settlement. Potts's testimony that he advised Tyson that the problem would have to be "cleared up" at some point shows that he knew the settlement basis was at issue. Potts's omission constituted a misrepresentation that assisted in his clients' fraudulent purpose of taking the joint tenancy accounts outside of the settlement agreement, a violation of Rule 1.2(d), M.R.P.C. Potts could have avoided this situation by withdrawing from representation under Rule 1.16, M.R.P.C.

¶56 Potts next argues that he did not know at the time of the events in question that his clients' conduct was fraudulent, and, therefore, he cannot be accused of violating Rule 1.2(d), M.R.P.C. Evon testified at a February 3, 2003, hearing that her lawyer knew

before the mediation that she would claim the joint tenancy accounts outside of any settlement agreement. The Commission admitted Evon's testimony on this point at the disciplinary proceedings, and Potts does not raise the issue on appeal.

¶57 Neither Potts nor his clients, Evon and Tyson, disclosed Evon's plans concerning the joint tenancy accounts at the November mediation. They offered no correction to the parties who had negotiated the settlement based on the $1.2 million total estate value that Evon had reported to the court in her final inventory in the conservatorship proceedings. Evon already had claimed a small portion of the money from the joint tenancy accounts by that time and was working on obtaining the remainder of the $270,000 in the week following the settlement. The evidence supports the Commission's finding that Potts knew of Evon's fraudulent conduct in misrepresenting to the other parties and the court her intent to secure the joint tenancy accounts outside the settlement.

¶58 Finally, Potts argues that his conduct did not constitute fraud under the definition provided in the April 1, 2004, amendments to the M.R.P.C. We note first that the ODC never accused Potts of fraud. The ODC accused Potts of assisting his clients in engaging in fraudulent conduct. Second, we note that the M.R.P.C., as they existed in 2001, at the time of the conduct in question, provided no definition of fraud or fraudulent conduct. As stated in ¶¶ 47-48, we conclude, however, that Potts's clients, Evon and Tyson, knowingly misrepresented the truth in order to prompt the other parties to the settlement to act to their detriment. In particular, Tyson directed Potts not to respond to Tremper's letter that had asked for confirmation on the settlement amount. Potts did more than acquiesce to his client's demands of silence in the face of Tremper's inquiries. Potts

assisted in his clients' fraud by drafting, circulating, and filing with the court a stipulation, stating that all disputes had been settled, when he knew that the other parties had relied on Evon's misrepresentation of the settlement basis in reaching the agreement. We agree with the Commission's conclusion that Potts violated Rule 1.2(d), M.R.P.C.

¶59    *Whether Potts violated Rule 3.3(a)(2), M.R.P.C.*

¶60    Potts argues that he could not have violated Rule 3.3(a)(2), M.R.P.C., because his clients were not engaging in continuing fraudulent acts and Potts was not assisting in such fraudulent acts. Potts further argues that he did not know at the time that his clients' conduct was fraudulent.

¶61    Rule 3.3(a)(2), M.R.P.C., sets forth the duty of candor toward the tribunal and prohibits a lawyer from knowingly failing "to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client." As stated in ¶¶ 47-48, Potts's clients engaged in fraudulent conduct that intended to deceive the other parties as to the scope of the settlement. Potts assisted in their deception.

¶62    Potts also violated the duty of candor toward the tribunal when he failed to disclose to the court the material fact that, contrary to what the parties believed, Evon planned on taking the joint tenancy accounts. Tremper's letter notified Potts that the settlement basis was at issue. Potts acknowledged the fact that the value of the settlement would have to be cleared up "sooner or later." At his client's request, Potts said nothing to Tremper about the potential misunderstanding. Knowing that this ambiguity existed in the memorandum, Potts nevertheless proceeded to misrepresent in the signed stipulation to the court that "all" disputes had been settled, when in fact they were just beginning to

21

brew under the surface. The stipulation caused the parties to forge ahead with the settlement, even though Potts and his clients knew that no agreement had been reached on the settlement amount.

¶63 Tremper's letter put Potts on notice that the parties were relying on Evon's $1.2 million final inventory as the value of the settlement when they signed the stipulation drafted by Potts and filed it with the district court. Potts did not report to the district court in the stipulation that Evon had taken some, and planned to take the rest, of the joint tenancy accounts outside the $1.2 million settlement. Potts had a duty of truthfulness in filing or representing any matter to the court. Potts's failure to do so violated Rule 3.3(a)(2), M.R.P.C.

¶64 *Whether the Commission improperly excluded Potts's proposed expert witness testimony.*

¶65 Potts argues that he should have been allowed to present expert witness testimony at his disciplinary hearing on the interplay between the duty of confidentiality and the duty of candor as stated in the M.R.P.C. The Montana Rules of Evidence apply to formal disciplinary proceedings before the Commission. Rule 12(C)(2), MRLDE. Under Rule 702, M. R. Evid., a party may offer expert testimony to assist the trier of fact in understanding the evidence or determining a fact in issue. Expert opinions that state a legal conclusion or apply the law to the facts are inadmissible. *Perdue v. Gagnon Farms, Inc.,* 2003 MT 47, ¶ 28, 314 Mont. 303, ¶ 28, 65 P.3d 570, ¶ 28. Potts disclosed to the Commission that the expert witness would opine that Potts did not violate the Rules of

22

Professional Conduct. The Commission properly excluded Potts's expert testimony as improperly offering an opinion on a legal question. *Perdue,* ¶ 28.

¶66 *Whether the Commission improperly excluded a portion of Potts's testimony as inadmissible hearsay.*

¶67 Potts argues that the Commission improperly excluded as hearsay his testimony regarding what Tremper had told him concerning the joint tenancy accounts. Potts testified that Tremper stated, three days before the parties signed the stipulation, that Tremper was "going after" the joint tenancy accounts if the case did not settle immediately. The Commission struck this statement from Potts's testimony on grounds that it constituted inadmissible hearsay. Potts argues that the statement does not qualify as hearsay because he did not offer the comment to prove the truth of the matter asserted—that Tremper would go after the joint tenancy accounts. He contends that he offered the statement instead to show Tremper's knowledge that the joint tenancy accounts existed and that the parties intended to exclude the accounts from the settlement.

¶68 Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), M. R. Evid. Hearsay is inadmissible unless the Montana Rules of Evidence provide an exception. Rule 802, M. R. Evid. A statement offered to show the effect on the witness, but not for the truth of the matter asserted, falls outside of the definition of hearsay. *Vincelette v. Metropolitan Life Ins., Co.,* 1998 MT 259, ¶ 19, 291 Mont. 261, ¶ 19, 968 P.2d 275, ¶ 19.

¶69 Potts appears to have offered the statement to demonstrate Tremper's alleged knowledge that the parties had intended to exclude the joint tenancy accounts from the settlement, and not for the truth of the matter asserted that Tremper would go after the joint tenancy accounts. Potts offered Tremper's statement to explain its effect on him, showing why he believed the joint tenancy accounts were separate from the settlement. For that reason, we conclude that the statement falls outside the definition of hearsay and that the Commission should have allowed it in evidence at Potts's disciplinary hearing. *Vincelette,* ¶ 19.

¶70 We also conclude, however, that improperly excluding the statement does not warrant reversal of the Commission's decision. An error must cause substantial prejudice to warrant reversal. *See In re A.J.E.,* 2006 MT 41, ¶ 28, 331 Mont. 198, ¶ 28, 130 P.3d 612, ¶ 28. The Commission's error in excluding the statement did not substantially prejudice Potts.

¶71 Tremper admitted on direct examination that he knew the joint tenancy accounts existed, but he believed them to be included in the settlement to satisfy Evon's alleged self dealing in the conservatorship proceedings. Tremper stated this belief in a letter to Potts dated November 20, 2001, that the Commission admitted into evidence at Potts's disciplinary hearing. Potts admitted that he did not respond to the letter. The nonresponse reasonably caused Tremper to believe that the parties intended to include the joint tenancy accounts in the settlement.

¶72 Tremper's knowledge of the joint tenancy accounts before the settlement conference does not change the fact that Potts later made a false representation to the

24

court in the stipulation. The stipulation wrongfully reported to the court that the parties had resolved all of the disputes surrounding the will contest and conservatorship. Tremper's letter informed Potts as to Tremper's belief that the settlement included the joint tenancy accounts. Potts ignored Tremper's inquiry. He proceeded to represent falsely in the stipulation to the court that the parties had resolved all the disputes surrounding the will contest and conservatorship.

¶73    *Whether the Commission's proposed sanctions are appropriate.*

¶74    Potts urges the Court to consider the mitigating factors as stated in the 1991 American Bar Association Standards for Imposing Lawyer Sanctions when determining the appropriateness of his discipline. Under ABA § 9.32, mitigating factors include: 1) the absence of prior discipline; 2) absence of a dishonest or selfish motive; 3) full and free disclosure and cooperative attitude toward the proceedings; and 4) character and reputation.

¶75    Potts contends that he has satisfied all the mitigating factors, including maintaining good character and reputation as an attorney since becoming a member of the State Bar of Montana in 1986. He argues that this factor renders a public censure unwarranted. The Commission responds that Potts's transgression includes aggravating factors, such as dishonesty, that warrant the imposition of a 30-day suspension from the practice of law or even harsher discipline.

¶76    We consider the following factors in determining the appropriate discipline for lawyer misconduct: 1) the duty violated; 2) the lawyer's mental state; 3) the actual or potential injury caused by the lawyer's misconduct; and 4) the existence of aggravating

25

or mitigating factors. Rule 9(B), MRLDE. We conclude that public censure is appropriate in light of Potts's misconduct in this matter and other mitigating circumstances.

¶77 The evidence clearly demonstrates that Potts assisted his clients in their fraudulent conduct by misrepresenting the scope of the settlement to the other parties, a violation of Rule 1.2(d), M.R.P.C. The evidence also supports the conclusion that Potts misrepresented to the district court that all disputes had been settled when in fact he knew that the settlement agreement lacked the requisite meeting of the minds to be enforceable, a violation of Rule 3.3(a)(2), M.R.P.C. Potts's misconduct resulted in considerable injury to the parties, requiring one district court proceeding and two appeals to this Court to determine the meaning and scope of the memorandum and stipulation.

¶78 The first sentence of the preamble to the M.R.P.C. (2005) states that a lawyer must "pursue the truth." The duties of candor toward the tribunal under Rule 3.3(a), M.R.P.C., and the prohibition against assisting in a client's fraudulent conduct under Rule 1.2(d), M.R.P.C., guide the lawyer in this quest for truth. In breaching this fundamental tenet, Potts shunned his most basic responsibility owed to the profession.

¶79 This level of misconduct ordinarily would draw punishment in the form of suspension from the practice of law or disbarment. Mitigating factors warrant a lighter penalty in this case. First, the evidence shows that the parties entered into a vague settlement agreement that failed to define the basis and scope of the agreement. Potts certainly took advantage of this rushed agreement for his clients' benefit and against the duty of truthfulness incumbent upon a lawyer. Potts should not carry all the blame,

26

however, for the extra litigation resulting from the vague agreement. Though we do not condone Potts's conduct in this matter, we recognize that the other parties could have resolved the question of the basis and scope of the settlement by specifically assigning a dollar amount to the estate value in the memorandum. Next, Potts benefits from the fact that the district court limited the actual damage caused by his misconduct. The district court determined that Potts's clients, Evon, had no right to the joint tenancy accounts in light of the parties' reliance on the $1.2 million total estate value. As a result, the actual damages occasioned by Potts's misconduct take the form of increased litigation costs rather than the hundreds of thousands of dollars of which the parties to the settlement agreement would have been deprived. Finally, the absence of any prior discipline against Potts and his character and good reputation to this point militate in his favor.

¶80 In light of these mitigating factors, especially Potts's history of compliance with the rules of professional conduct and his character and good reputation to this point, we determine that the Commission's recommendation to suspend Potts from practice is unwarranted. We conclude that a public censure will apprise Potts sufficiently of the gravity of his misconduct under the given circumstances. Moreover, a public censure will alert the public that the Court will not tolerate such misconduct from a lawyer. We also order Potts to pay the costs of the disciplinary proceedings before the Commission.

## ORDER

**THEREFORE IT IS ORDERED:**

¶81 1. Steven T. Potts is ordered to appear before the Supreme Court of the State of Montana on May 2, 2007, at 1:30 p.m., for the administration of a public censure;

27

¶82   2. Steven T. Potts shall pay, or make arrangements to pay, the costs of the proceedings before the Commission.  Pursuant to Rule 9(A)(8), MRLDE, Disciplinary Counsel is directed to assemble and serve upon Steven T. Potts an itemized list of the costs and expenses incurred in this matter.  Steven T. Potts shall then have 10 days thereafter to file written objections and, if he desires, to request a hearing before an Adjudicatory Panel;

¶83   3.  It is further ordered that Potts's Motion to Strike Portions of ODC's Brief, filed with this Court on August 10, 2006, is denied;

¶84   4.  The Clerk of this Court is directed to mail copies of this Order to Steven T. Potts by certified mail, return receipt requested, and by ordinary mail to Steven T. Potts's attorney, the Chairman and the Secretary of the Commission on Practice, the Clerk of the Federal District Court for the District of Montana, the Clerk of the Circuit Court of Appeals of the Ninth Circuit, the Office of Disciplinary Counsel, the Executive Director of the State Bar of Montana, and by electronic transmission to all Clerks of the District Courts of the State of Montana and to all District Judges.

DATED this 22nd day of March 2007.

/S/ BRIAN MORRIS
/S/ JOHN WARNER

/S/ JEFFREY M. SHERLOCK
District Court Judge Jeffrey M. Sherlock sitting
for Justice W. William Leaphart

/S/KURT KRUEGER
District Court Judge Kurt Krueger sitting for
Justice James C. Nelson

Justice Jim Rice concurs in part and dissents in part.

¶85 I concur with the Court's resolution of the issues related to the professional conduct rule violations and the evidentiary questions raised herein. I dissent, however, from the Court's determination to revise the sanction recommended by the Commission on Practice.

¶86 The Court's opinion establishes that Potts should have withdrawn from representation as soon as his clients' demands "propelled his services into the realm of assisting in his clients' fraudulent behavior." However, he did not withdraw, thereby violating Rule 1.16, M.R.P.C. Further, he proceeded to violate Rule 1.2, M.R.P.C., by making misrepresentations "that assisted in his clients' fraudulent purpose." Recognizing that "Potts did more than acquiesce to his clients' demands of silence," the Court holds that "Potts assisted in his clients' fraud by drafting, circulating, and filing with the court a stipulation[] stating that all disputes had been settled" when he knew otherwise. The Court concludes by holding that Potts violated Rule 3.3, M.R.P.C., by violating the duty of candor to the tribunal before which he had appeared.

¶87 The Office of Disciplinary Counsel has argued that this serious matter warrants a more severe sanction than recommended by the Commission, but that the recommended discipline is "appropriate as a minimum" necessary to "justify the public's faith in the concept that lawyers must always pursue the truth."

¶88 After hearing the evidence in this complex proceeding, assessing the credibility of the parties, and drawing on its experience in the handling of many disciplinary matters, the Commission recommended the imposition of a thirty-day suspension, in addition to a

public censure and payment of costs.  I cannot concur with the Court's conclusion that a thirty-day suspension is "unwarranted" under the facts of this case, and I would adopt the Commission's recommendation.


/S/ JIM RICE


We join in the concurring and dissenting opinion of Justice Rice.


/S/ JOHN C. McKEON
Honorable John C. McKeon, District
Judge, sitting in place of Chief Justice
Karla M. Gray


/S/ HOLLY BROWN
Honorable Holly Brown, District Judge,
sitting in place of Justice Patricia Cotter