No. 05-174

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 172

_____

IN THE MATTER OF JOSEPH ENGEL, III,  )  O P I N I O N
An Attorney at Law.  )  A N D
  )  ORDER
Respondent.  )

_____

¶1 The Commission on Practice of the Supreme Court of the State of Montana (the Commission) entered its findings of fact, conclusions of law, and recommendation to the Court on November 20, 2006, regarding a complaint filed against Joseph Engel, III, (Engel), an attorney licensed to practice law in the State of Montana. The Office of Disciplinary Counsel of the State of Montana (ODC) alleged in its complaint that Engel had violated numerous provisions of the Montana Rules of Professional Conduct (MRPC). The Commission concluded that no clear and convincing evidence supported the allegations made in the complaint. The Commission recommends that this Court dismiss the complaint. ODC objects to the Commission's recommendation. We conclude that Engel violated Rules 1.5, 1.15, and 1.18, MRPC. We remand this matter to the Commission for its consideration and recommendation of an appropriate sanction.

¶2 ODC presents the following issues for review:

¶3 1. Whether Engel violated Rule 1.5, MRPC, by charging an excessive fee for his legal services in a trust termination action.

¶4 2. Whether Engel violated Rules 1.15 and 1.18, MRPC, by failing to deposit retainer fees in an IOLTA or client trust account.

¶5 3. Whether Engel violated Rule 1.7, MRPC, by engaging in a conflict of interest.

1

¶6    4. Whether Engel violated Rules 1.14, 2.1, 8.4(c), MRPC, by failing to advise his client that a relative had mismanaged her affairs.

## FACTUAL AND PROCEDURAL BACKGROUND

¶7    We discussed most of the facts giving rise to this matter in *In re Conservatorship of Kloss*, 2005 MT 39, 326 Mont 117, 109 P.3d 205.  We will repeat here only those facts necessary for our analysis.  Alice Kloss (Kloss) was born on November 26, 1906.  She died April 22, 2006, at the age of 99.  Kloss, a widow, had no relatives living in Montana until 1998, when she fell and broke her legs, hip, and pelvis.  The injuries forced her to move from her apartment to an assisted living facility in Great Falls.  Kloss established the Alice P. Kloss Charitable Remainder Trust (CRT) on May 19, 1998.  The CRT consisted of $365,000 from Kloss's roughly $1,000,000 estate.

¶8    After her injuries, Kloss requested that Kenneth Parrent (Parrent), her 71-year-old nephew, move from Colorado to Great Falls to assist in the care of her affairs.  Kloss executed an unlimited power of attorney for Parrent to manage her assets.  Engel represented Kloss in three legal matters: an action to terminate the CRT; a tort claim against Edward D. Jones; and a conservatorship proceeding involving Kloss.  Kloss paid Engel approximately $296,000 for his services in these three separate matters.

¶9    Engel originally signed a fee agreement with Kloss on July 1, 1998, to terminate the CRT for an hourly rate of $125.  Parrent signed the fee agreement on Kloss's behalf.  Engel filed a petition to terminate the CRT on September 21, 1998.  All of the CRT's beneficiaries voluntarily relinquished their interests.  The District Court terminated the CRT on October 14, 1998.  Engel's bills indicate that he performed 65.9 hours of work in

terminating the CRT. Kloss paid Engel $8,362.50 for this work in 1998 according to the terms of the hourly agreement signed by Engel and Parrent.

¶10    Engel signed a second fee agreement with Kloss on October 27, 1998. This second fee agreement related to Kloss's action against her former brokerage firm, Edward D. Jones, and its manager. Kloss alleged that Edward D. Jones tortiously had caused her to execute the CRT. Parrent retained Engel to prosecute the action and to represent both Kloss's and Parrent's interests. The parties eventually settled the action with Edward D. Jones agreeing to pay $150,000 to Kloss.

¶11    Kloss paid Engel a retainer of $20,000 pursuant to the October 27, 1998, agreement. The second fee agreement provided that Engel would bill Kloss at an hourly rate of $125 from the $20,000 retainer. The second fee agreement further provided that Kloss and Engel would divide any recovery in the action against Edward D. Jones, with Engel receiving thirty-five percent and Kloss receiving sixty-five percent. Engel received an additional $50,000 retainer in January 2002. Engel's accounting principles make it impossible to determine precisely to which litigation this $50,000 retainer fee applied. Engel contends that he used this $50,000 retainer fee to cover the cost of his work in a separate conservatorship action involving Kloss. It should be noted, however, that this conservatorship proceeding began in June 2003, about 18 months after Engel received the $50,000 retainer fee. Engel did not place either of these retainers into an IOLTA account or a client trust account. Engel instead placed the $20,000 and $50,000 retainers directly into his operating account.

¶12    Engel next modified the original July 1, 1998, fee agreement with Kloss relating to

3

the termination of the CRT. Engel informed Kloss of the purported novation of the agreement through a letter that he sent to Kloss on February 1, 2000, in which he transmogrified the hourly fee arrangement for work already completed into a contingent fee. Engel informed Kloss that the contingent fee for representing her in the CRT termination almost two years earlier would be one-third of the amount that he had "recovered" through his prosecution of the uncontested termination proceeding. Kloss signed the consent form on the bottom of the letter on February 22, 2000.

¶13 Engel further refined the fee agreement relating to the CRT termination through a letter to Parrent on July 5, 2000. Engel acknowledged receipt of $10,000 and confirmed that he would receive $10,000 monthly installments for the remainder of the year 2000, for a total of $70,000. Engel further informed Parrent that the remaining $50,000 due under the CRT termination fee agreement would be payable in 2001 with the specific timing being a "matter of mutual convenience."

¶14 Engel revised the 1998 CRT agreement a final time on October 3, 2003, through a "supplemental attorney-client fee contract." Engel intended this supplemental agreement to "replace[] entirely" the original hourly fee agreement and to be "retroactively effective" from July 1, 1998. The supplemental agreement provided that Engel would receive one-third of $365,000, the same amount as the value of the CRT.

¶15 ODC investigated a complaint regarding Engel's representation of Kloss. ODC alleged in a formal complaint that Engel had committed four counts of professional misconduct. The first count alleges that Engel had charged an unreasonable fee for his representation of Kloss in the CRT termination action in violation of Rule 1.5, MRPC.

4

The second count charges that Engel violated Rules 1.15 and 1.18, MRPC, by failing to deposit the $20,000 and $50,000 retainer fees in a trust account. Count Three alleges that Engel's representation of Kloss and Parrent constituted a conflict of interest in violation of Rule 1.7, MRPC. The fourth count accuses Engel of violating the duty of loyalty by failing to protect Kloss from Parrent's alleged misuse of her assets.

¶16 The Commission heard the matter on September 22, 2006. The hearing focused on the fee arrangements that Engel had entered with Kloss between 1998 to 2003. Engel testified that he viewed Kloss as "competent" and working "in concert" with Parrent. Engel further testified that he modified the July 1, 1998, fee agreement two years after the CRT had been terminated because he wanted to find a way to pay for Kloss's tort action against Edward D. Jones without exhausting Kloss's resources. Engel admitted that the CRT termination and the Edward D. Jones tort litigation constituted two separate matters, but Engel testified that he treated the CRT recovery as part of the "entire matter." Engel also agreed with the Commission that he created cumbersome, confusing, ambiguous documents that needed explanation.

¶17 The Commission determined that no clear and convincing evidence supported the allegation in the complaint against Engel. The Commission recommends that this Court dismiss the complaint. ODC objects.

**STANDARD OF REVIEW**

¶18 This Court "possesses original and exclusive jurisdiction and responsibility" in all matters involving the disciplining of lawyers in the State of Montana. *See* Introduction, Montana Rules for Lawyer Disciplinary Enforcement. As a result, we review *de novo* the

Commission's findings of fact, conclusions of law, and recommendations. We weigh the evidence upon which the Commission's findings rest. *In the Matter of Potts*, 2007 MT 81, ¶ 32, 336 Mont. 517, ¶ 32, 158 P.3d 418, ¶ 32.

## DISCUSSION

¶19 We first must address Engel's motion to dismiss ODC's objections to the Commission's recommendation. Engel argues that the Montana Rules for Lawyer Disciplinary Enforcement (MRLDE) do not allow this Court's review of ODC's objection unless ODC first sought reconsideration of the Commission's decision under Rule 14, MRLDE. Engel asserts that Rule 14, MRLDE, requires the ODC to petition for reconsideration within thirty days of the panel's decision. Rule 14, MRLDE, provides that "[t]he Supreme Court may, in its sole discretion, review the Panel's disposition upon reconsideration." Engel contends that ODC's failure to request reconsideration of the panel leaves this Court with nothing to review.

¶20 Rule 14's limitation of this Court's review to matters that had been reconsidered by the Commission does not apply to formal complaints submitted by ODC. Rule 14 sets forth the procedures to be taken by the "Adjudicatory Panel" when a "complainant" requests reconsideration of a disposition of a complaint. Rule 14's history reveals, however, that ODC does not qualify as a "complainant." Rule 14 originated out of former Rule 8B. Rule 8B existed before this Court made global changes to the lawyer disciplinary system that became effective in July 2002. Former Rule 8B and Rule 14 are nearly identical with the exception that Rule 14 substitutes the term "Panel" for "Commission."

6

¶21 The need for the change from "Commission" to "Panel" arose from the fact that Rule 8B operated when the Commission performed both prosecutorial and adjudicatory functions in the disciplinary system. Former Rule 8B applied only to complainants submitting informal complaints. The Commission would not give notice to itself under Rule 8B that it could request review of its own determination. This Court adopted the language of former Rule 8B almost verbatim in creating the new Rule 14. Rule 14 likewise applies to the informal complaints rather than the formal complaints lodged by ODC.

¶22 Moreover, Rule 14, MRLDE, applies to matters pending before an "Adjudicatory Panel." The Commission's filing of its findings, conclusions, and recommendations with this Court on November 20, 2006, precludes the panel from reconsidering its decision as the matter is no longer "pending" before the panel. Rule 14, MRLDE. We deny Engel's motion to dismiss ODC's objections to the recommendations of the Commission.

¶23 *Whether Engel violated Rule 1.5, MRPC, by charging an excessive fee for his legal services in a trust termination action.*

¶24 ODC challenges the Commission's finding that Engel's fees of approximately $296,000 were not excessive when "taken as a whole." ODC argues that Engel's fees must be examined as two separate matters as evidenced by the two separate fee agreements entered by the parties. ODC points out that the July 1, 1998, fee agreement related to the termination of the CRT, while the October 27, 1998, fee agreement addressed Engel's representation of Kloss in the separate tort action against Edward D. Jones. ODC argues that Engel's fee of $121,545 under the July 1, 1998, fee agreement

constituted an unreasonable fee in light of the work Engel had performed to terminate the CRT.

¶25 A lawyer's fees must be reasonable. Rule 1.5(a), MRPC. We consider the following factors in determining the reasonableness of a lawyer's fee: 1) the labor and time required, the novelty and difficulty of the question involved, and the requisite skill to perform the legal services properly; 2) the likelihood that the acceptance of the particular employment would bar the lawyer from accepting other employment; 3) the fee customarily charged in the locality for similar legal services; 4) the amount involved and the results obtained; 5) the time limitations imposed by the client or by the circumstances; 6) the nature and the length of the professional relationship with the client; 7) the experience, reputation, and ability of the lawyer performing the services; 8) whether the fee is fixed or contingent. Rule 1.5(a), MRPC.

¶26 Engel testified that he possesses no particular expertise in the area of trusts. The CRT termination was a simple process as evidenced by the fact that the matter had been uncontested. All of the CRT's beneficiaries voluntarily relinquished their interests. The district court terminated the CRT within one month of Engel filing the petition.

¶27 Helena lawyer Dan McLean (McLean) testified as an expert witness for ODC. McLean's practice focuses on estate planning and probate trust administration. McLean testified that the termination of Kloss's CRT was "a pretty simple process" that "would not have taken a great deal of time and effort." McLean further testified that the customary fee in Great Falls in 1998 for terminating a CRT ranged between $1,500 and $2,500.

¶28 Kloss initially paid Engel $8,362.50, according to the terms of the hourly agreement signed by Engel and Parrent. This amount far exceeds the going rate of $1,500 to $2,500 for this type of work in Great Falls in 1998. Engel's bills indicate that he performed 65.9 hours of work in terminating the CRT. Engel then modified his fees two years after the CRT had been terminated and after he had been paid for such work. Engel changed his fee from his hourly rate of $125 to a contingency fee, wherein Engel would collect one-third of the $365,000 that Kloss had recovered in the CRT termination action. Engel collected $121,545 for his work in terminating the CRT.

¶29 ODC aptly describes Engel's justification for revising the CRT termination fee agreement as "hard to pin down." These justifications range from having exhausted his $20,000 retainer in the separate Edward D. Jones tort case to some sort of illusory tax advantage for Kloss. The Commission nevertheless determined that Engel's fees were not excessive when "[t]aken as a whole." Taking Engel's fees "as a whole" requires the Commission to merge the work that Engel performed in terminating the CRT with the work that Engel performed in the following years in the separate Edward D. Jones tort case. The parties signed separate fee agreements for each case. The two separate fee agreements specified the work to be performed by Engel and specified the fee that Engel would receive for his services in each matter.

¶30 We cannot agree with the Commission's conclusion that Engel's fees were not excessive, even when "taken as a whole." Engel received $121,545 for an uncontested trust termination proceeding. He also received approximately $175,000 from Kloss for his work in the Edward D. Jones tort litigation and his brief representation of Kloss in a

9

conservatorship proceeding. The tort case settled with Edward D. Jones agreeing to pay $150,000 to Kloss. Engel's lack of transparency in his accounting practices makes it nearly impossible to determine whether Engel's fee swallowed Kloss's entire recovery. We need not analyze the reasonableness of Engle's fee in the Edward D. Jones tort litigation, however, as that matter presently is not before us.

¶31 Engel further justifies the size of the fee for his work in pursuing the uncontested dissolution of the CRT based on the alleged aggressive litigation tactics employed by counsel for Edward D. Jones in the separate tort litigation, including a petition for appointment of a conservator for Kloss filed by counsel for Edward D. Jones. *Kloss*, ¶ 14. During the discovery process, Robert James (James), counsel for Edward D. Jones, learned that Kloss's estate had been depleted of more than $800,000 under Parrent's management, with over $400,000 being paid to Parrent and Engel for their services. *Kloss*, ¶ 5. James sought appointment of an outside conservator for Kloss. James filed the petition separately and in a different court from the Edward D. Jones tort litigation.

¶32 Engel fails to inform, however, that he first changed the fee agreement for terminating the CRT on February 1, 2000. James did not file a petition for appointment of a conservator for Kloss until June 12, 2003. Moreover, Engel never sought to change the fee agreement for the Edward D. Jones tort litigation. In fact, Engel sent Parrent a bill, dated March 7, 2000, which showed a balance of $3,812.79 for the original $20,000 retainer paid by Kloss in the Edward D. Jones tort case. Engel nevertheless had deemed it appropriate, a month earlier, to modify the CRT termination agreement.

¶33 The Commission's decision allows Engel to merge fee agreements for two

10

separate matters into a single, indecipherable whole. Engel provides an excuse without explanation for each maneuver undertaken by him to increase his fee for work already performed and for which Kloss already had paid. The modified fee agreement for the CRT termination mentions nothing about payment to Engel for legal services in the separate Edward D. Jones tort litigation. Engel's fee of $121,545 in an uncontested proceeding to terminate the CRT cannot be deemed reasonable under any circumstances. We conclude that Engel violated MRPC 1.5.

¶34 *Whether Engel violated Rules 1.15 and 1.18, MRPC, by failing to deposit retainer fees in an IOLTA or client trust account.*

¶35 Engel received a $20,000 retainer from Kloss in accordance with the October 27, 1998, fee agreement. Kloss also paid Engel a $50,000 retainer in January 2002 that Engel claims to have applied to his representation of Kloss in the James conservatorship proceeding. Engel deposited both retainer funds into his operating account. Engel testified that he did not need to place the funds in a trust account because he received the payments as "retainer, engagement fees" that he would earn within a short period of time.

¶36 The Commission concluded that Engel exercised good faith judgment in accordance with Rule 1.18(c)(2)(C), MRPC, in anticipating that the $20,000 retainer had been or would be earned in a short period of time, and, therefore, not subject to the rule's requirement that such funds be placed in a trust account. ODC counters that the Commission misinterpreted Rule 1.18(c)(2)(C), MRPC, and overlooked entirely the $50,000 retainer that Engel also deposited in his operating account.

¶37 All client funds must be deposited into either an IOLTA trust account or "a

separate interest-bearing account for a particular client's matter with the net interest paid to the client." Rule 1.18(c)(3), MRPC. The choice whether to place the funds in an IOLTA account or a client trust fund depends on the amount of the fund or the length of time that the amount of funds are to be held. Client funds deemed nominal in amount or held for a short period of time must be deposited in an IOLTA account. Rule 1.18(c)(2)(A), MRPC. Client funds that are not nominal in amount or that are to be held for a long period of time, by contrast, may be deposited in a client trust fund. Rule 1.18(c)(3), MRPC.

¶38    Engel seems to argue, and the Commission seems to accept, that a third category exists for soon-to-be-earned fees. Engel contends that retainers that represent soon-to-be-earned fees may be deposited directly into a lawyer's operating account. We disagree. The rules provide no option for placing client funds directly into a lawyer's operating account.

¶39    The decision as to whether a client's funds are nominal in amount or to be held for a short period of time rests solely within the sound judgment of the lawyer. A lawyer who exercises good faith judgment in determining whether client funds are nominal in amount or to be held for a short period of time shall not be charged with professional misconduct or ethical impropriety related to such decision. Rule 1.18(c)(2)(C), MRPC. Engel could have decided that the $20,000 and $50,000 retainers were to be held for a short period of time in light of his claim that he soon would earn them. In that case, however, Engel should have deposited the retainers in an IOLTA account. The rules

12

provide no option for depositing a client's retainer directly into a lawyer's operating account.

¶40   Rule 1.18, MRPC, when read in its entirety, affords a lawyer a certain amount of discretion in determining whether a client's funds must be placed in an IOLTA account or a client trust fund.  Thus, Engel might have faced a legitimate choice between whether to deposit the retainers in an IOLTA account or a client trust account.  The rule does not give the lawyer the option, however, of placing the client's funds in the lawyer's operating account.  In fact, Rule 1.15, MRPC, forbids the commingling of such funds.  The rule requires a lawyer to hold his client's property in connection with representation separate from the lawyer's own property.

¶41   Engel deposited the $20,000 and $50,000 retainers into his operating account rather than depositing the funds in an IOLTA account or a client trust account.  This act violates Rules 1.15 and 1.18, MRPC.  We cannot accept, and the rules do not condone, Engel's explanation that he soon would earn the funds, and thereby justify his decision to place the client funds in his operating account.

¶42   *Whether Engel violated Rule 1.7, MRPC, by engaging in a conflict of interest.*

¶43   Rule 1.7, MRPC, forbids a lawyer from representing a client if the representation of that client will be directly adverse to another client unless the lawyer reasonably believes the representation will not adversely affect the relationship with the other client and the client consents after consultation.  ODC argues that Engel violated Rule 1.7, MRPC, by representing Parrent in a 1998 petition before the district court for his appointment as conservator of Kloss's estate.  ODC contends that such representation

13

constituted a conflict of interest because Engel's representation of Parrent was directly adverse to his representation of Kloss.

¶44 The Commission concluded that no conflict of interest had occurred under Rule 1.7, MRPC, by Engel's brief representation of both Kloss and Parrent in a 1998 conservatorship petition filed by Engel. No court ever appointed Parrent as conservator and, from the record, it appears that Engel and Parrent have not further pursued the matter. The Commission also considered that Engel's efforts in the 1998 conservatorship proceeding may have constituted a legitimate tactical move in the separate Edward D. Jones tort litigation. Our review of the evidence indicates insufficient support for ODC's claim that Engel violated Rule 1.7, MRPC.

¶45 *Whether Engel violated Rules 1.14, 2.1, 8.4(c), MRPC, by failing to advise his client that a relative had mismanaged her affairs.*

¶46 ODC contends that Engel knew that Parrent had not acted in the best interest of Kloss, and, therefore, violated the duties imposed on a lawyer under Rules 1.14, 2.1, 8.4(c), MRPC. Rule 1.14, MRPC, sets forth a lawyer's responsibility in dealing with a client who lacks the mental ability to make decisions in connection with representation. Rule 2.1, MRPC, outlines the lawyer's role as an advisor, stating that a lawyer "shall exercise independent professional judgment and render candid advice." Rule 8.4(c), MRPC, prohibits a lawyer from engaging "in conduct involving dishonesty, fraud, deceit, or misrepresentation."

¶47 No clear and convincing evidence supports the claim that Kloss suffered from a mental disability. Rule 1.14, MRPC, does not apply, therefore, to Engel's representation

of Kloss. Our review of the record also reveals a lack of clear and convincing evidence to support a finding that Engel had violated Rules 2.1 and Rule 8.4(c), MRPC.

## CONCLUSION

¶48 Engel violated Rule 1.5, MRPC, by charging an unreasonable fee for his legal services in the CRT termination. Engel also violated Rules 1.15 and 1.18, MRPC, by depositing client funds into his operating account.

## ORDER

**THEREFORE IT IS ORDERED:**

¶49 1. We reject the Commission's recommendations as to Counts One and Two.

¶50 2. We adopt the recommendations of the Commission as to Counts Three and Four.

¶51 3. We remand this matter to the Commission for its consideration and recommendation of an appropriate sanction for Engel's violation of Rules 1.5, 1.15, and 1.18, MRPC.

¶52 4. The Clerk of this Court is directed to mail copies of this Order to Joseph Engel, III, by certified mail, return receipt requested, and by ordinary mail to Joseph Engel's attorney, the Chairman and the Secretary of the Commission on Practice, the Office of Disciplinary Counsel, and the Executive Director of the State Bar of Montana.

DATED this 17th day of July 2007.

/S/ KARLA M. GRAY
/S/ BRIAN MORRIS
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ JIM RICE

15